**THREE RIVERS MOTORS COMPANY**

v.

**The FORD MOTOR COMPANY and Auto-Lite Corporation.**

**Civ. A. No. C.A. 73–174.**

United States District Court,
W. D. Pennsylvania.

April 18, 1974.

Metz, Cook, Hanna & Kelly, Pittsburgh, Pa., for plaintiff.

Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for defendants.

## OPINION AND ORDER

SNYDER, District Judge.

This Court has for decision a Motion to Dismiss the Complaint filed by the Defendant Ford Motor Company (Ford) pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. The Motion sets forth in substance that Three Rivers Motors Company (Three Rivers) when it resigned its Ford Dealership Franchise, executed and delivered to Ford a General Release covering all claims which the Plaintiff had, or could have, against Ford. Therefore, Ford asserts that the release bars this anti-trust action. The Defendants filed an Affidavit of the Assistant Secretary of Ford setting forth that Three Rivers resigned its Ford Motor Agreement (franchise) effective February 9, 1970, and in connection with said resignation delivered to Ford the General Release, a copy of which was attached.[1]

At the argument on the Motion, Counsel for Three Rivers there advised the Court that a Petition to Set Aside the Release had just been filed. The Petition asked ". . . this Court to set aside the release given" to Ford by Three Rivers on account of alleged duress employed by Ford. The Defendants were given leave to file an Answer to the Petition, and they filed a Motion to

---

1. The Release read as follows:

"GENERAL RELEASE

KNOW ALL MEN BY THESE PRESENTS:

THREE RIVERS MOTORS COMPANY, a Delaware corporation, with its principal place of business at 2121 Robinson Boulevard, Wilkinsburg, Pennsylvania (hereinafter called 'the Dealer'), by W. A. WINTERHALTER, its President (hereinafter called 'the Principal') being the owner of the Dealer, for and in consideration of the sum of One Dollar paid to the Dealer by Ford Motor Company, a Delaware corporation with offices at The American Road, Dearborn, Michigan, and in consideration of Ford's providing substantial Dealer Development Funds to East Hills Ford, Inc. in order to purchase certain property of the Dealer, hereby jointly and severally, for itself, himself or herself, and their respective heirs, representatives, successors and assigns, releases, remises and forever discharges Ford and its successors and assigns of and from all and all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever in law, in admiralty or in equity, which against Ford, the Dealer or the Principal, or their respective heirs, representatives, successors or assigns, ever had, now have or which they or any of them hereafter can, shall or may have, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of these presents, excepting herefrom, however, only such liability, if any, as Ford may have to the Dealer for warranty, products, and parts liability for which claims and/or suits are made/filed against Three Rivers Motors Co., with regard to sales and/or services performed by Three Rivers Motors Co., on or before the date of the closing held on this date. It is understood that only one claim is now outstanding, namely, that of Eazor Trucking Company vs. Three Rivers Motors Co., and The Ford Motor Company, No. 1347 January Term, 1970, in the Court of Common Pleas of Allegheny County, Pennsylvania.

As to future claims and/or suits, it is a prerequisite to qualify for this exception that Three Rivers Motors Co. notify Ford in writing promptly after receiving notice of any claim and/or suit so as to prohibit any prejudice to Ford in such matter. Notice shall be made by mailing the same to Robert M. Johnson, Esq., Office of the General Counsel, Ford Motor Company, The American Road, Dearborn, Mich. 48121.

IN WITNESS WHEREOF, this Release has been duly executed and delivered to Ford this *12th* day of *Feb.*, 1970."

Dismiss stating that the Petition failed to aver a sufficient basis to avoid or set aside the release executed by Three Rivers. In particular, the Defendants' Motion to Dismiss set forth that: "under applicable principles of law, the character of duress which is required to be shown in order to raise a question that a general release was executed under duress must be of such kind and character as to overcome the free volition of the party executing the release." The Motion to Dismiss also requested the Court to enter judgment under Rule 12 on the grounds that the General Release, as executed by the Plaintiff in this case, is a complete bar to all of the claims alleged in its Complaint.

An Evidentiary Hearing was held on October 19, 1973, and after due consideration of all the testimony, the briefs and arguments of counsel, this Court concludes that the Defendant's Motion to Dismiss the Plaintiff's Petition must be denied and the Release must be held inoperative in this particular case.

Mr. William Winterhalter, President of Three Rivers, testified at the Hearing that in 1966 he first contacted Ford with respect to resigning. He was informed at that time that Ford would not buy back his new parts, accessories and equipment inventory. As a result of that fact, he concluded that the amount he would receive would be considerably less than the value of his inventory if he had to proceed to auction, and, therefore, he rescinded his resignation. He said he had requested Ford's assistance in helping him to find a buyer for his facility but was informed by Ford that they would not approve another dealer in that facility, and that it would be necessary for him to acquire a new facility. After he acquired a new facility, a purchaser was found by the name of Marvin Yollin. A Buy-Sell Agreement was duly executed with the sale to be consummated on December 31, 1969. After several extensions, final arrangements were made for sale on February 6, 1970. The Agreement included the purchaser's obligation to buy the parts and equipment inventory. At the time of the closing he was asked to sign the Release on behalf of Three Rivers. The testimony further developed that at least until the Spring of 1967, the Agreement between Three Rivers and Ford (as well as with other Ford Dealers) was that Ford had the option, but not the obligation, to buy back any vehicle, parts, etc., in the event the Dealer resigned. In June of 1967, Ford Sales Agreements were changed to provide that not only when termination was initiated by Ford, but also when a Dealer resigned, Ford had the obligation, and not the mere option, to buy back the vehicles, parts, etc. It appears that pursuant to this policy change, and in November of 1969, Three Rivers was demanding that Ford buy back the parts. Instead, an agreement was apparently worked out with the prospective purchaser, Marvin Yollin, primarily negotiated through Ford, for a total consideration of $524,000.00. It appears that $240,000.00 was put up by Ford and the balance by the purchaser. Of this $524,000.00, some $391,000.00 went to Ford to pay off the four financing plans on the new vehicles, and the balance of $133,804.00 went to Three Rivers.

An exception was added to the original release form as submitted in December, 1969, and prior to closing, at the insistence of Three Rivers which retained Ford's liability after closing for any claims and/or suits filed against Three Rivers with regard to Ford's liability on warranty for products or parts. Finally, at the closing when Mr. Winterhalter (Three River's President) asked his lawyer if he had to sign the Release, he was informed that he had no choice and he would have to sign the Release if any deal was to be consummated.

In addition, the testimony indicated that prior to the closing of the transaction, Three Rivers attempted to negotiate on the prices to be paid for the parts and equipment but Ford set the prices and no deviations were permitted.

Henry W. Fulton testified on behalf of Ford that he was the attorney for

Marvin Yollin on the monies furnished by Ford through its Dealer Development Program at the time of the creation of East Hills Ford. Mr. Yollin contributed $60,000.00 and Ford contributed $240,000.00. Mr. Fulton substantiated the Plaintiff's contention that the entire transaction was worked out through Ford's Dealer Development Representative, Beecher Lingerfelt. He insisted that the only question which was raised regarding the Release had to do with some problems with a suit of Eazor Trucking against Three Rivers involving Ford warranties. Three Rivers asked for an exception which was subsequently put into the Release. Mr. Fulton further confirmed the fact that under the terms of the Buy-Sell Agreement with East Hills Ford, a general release had to be obtained in order to open up the new franchise. His only testimony with respect to the form of the Release was that since no question had been raised about it, there had been no discussion with Ford as to whether or not the transaction would have gone through if Three Rivers had refused to sign that particular form of release.

The Plaintiff asked the Court to consider the Affidavit of J. Norman Davis, stating that he was counsel for Three Rivers in 1969 and 1970 when the Ford Franchise was terminated; that the Release given by the Plaintiff in connection with that termination related only to matters having to do with the Franchise Agreement; that he was unaware of any anti-trust violations at that time, and did not contemplate or advise Three Rivers or any of its Officers of the possibility of an action against Ford for such violations; that the Release was "not intended as a release of unknown claims resulting from the violation of the antitrust laws." (Affidavit at ¶ 9).

## I. DISCUSSION

Between 1951 and 1965, Three Rivers had operated as a profitable Ford Dealership. Between 1966 and 1970, Three Rivers sustained an annual loss and, under Ford's Dealer Development Program, entered into a Buy-Sell Agreement with East Hills Ford. As part of the entire transaction there was included the execution of a General Release to Ford in the form set forth in Footnote 1. In this action, Three Rivers claims that Ford's sales restrictions, pricing policies, and various financing arrangements it had with other Dealers violated the Anti-Trust laws, and that it was damaged as a result of Ford's unlawful activity. The Release purported to discharge Ford "of and from any and all manner of action and actions, cause or causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever in law, in admiralty or in equity . . . . upon or by reason of any manner, cause or thing whatsoever from the beginning of the world to the date of these presents . . ."

Under the Affidavits as filed and the testimony received at the Hearing on the Petition to Set Aside the Release, it was clearly established that Ford desired and secured a General Release. There was no indication of any fraud, accident, mistake or misrepresentation.

It is just as clear, however, that the matter of antitrust actions was not, in any way, a part of the negotiations which led to the Release; what concerned the parties was the purchase and sale of assets, any claims in relation thereto, as well as claims inter se concerning the dealership operations.

Three Rivers lost $42,782.00 in 1966, and at that time, through its President, attempted to terminate the Dealership. Ford refused to buy back new parts, accessories, and equipment inventory having an estimated value of $150,000.00. Following this refusal, Three Rivers rescinded its resignation and continued in business. Also in 1966, Ford advised Three Rivers that its facilities were inadequate and directed that new facilities be obtained. Three Rivers accordingly purchased a five acre track of land in

the Borough of Wilkinsburg, Pennsylvania, on which Ford (through its Realty Company) built a building and leased it to Three Rivers. Three Rivers moved into the new facility in September of 1968, after having registered a loss of nearly $10,000.00 in 1967. Three Rivers incurred a loss of $23,773.00 in 1968 and in 1969, again facing continued losses, Three Rivers resigned. Before accepting the resignation, however, Ford demanded the Release, which has been previously set forth, from Three Rivers. We must answer the question as to what effect should be given to the Release in regard to the present anti-trust action.

## II. APPLICABILITY OF FEDERAL OR STATE LAW ON THE INTERPRETATION OF RELEASES

We begin this discussion with the principle that it is Congressional policy to rely heavily upon the private sector for enforcement of anti-trust laws. Zenith Radio Corp. v. Hazeltine Research, 401 U.S. 321, 336, 91 S.Ct. 795, 28 L. Ed.2d 77 (1971); Minnesota Mining v. New Jersey Wood F. Co., 381 U.S. 311, 317–318, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965). There is strong authority indicating that in view of this Federal policy, Federal law should wholly displace State law governing the release of anti-trust claims. In Zenith, supra, the Court assumed the question of whether the release of an anti-trust defendant released his co-conspirators as a matter to be determined without reference to particular state rules on releases. Cf. Dice v. Akron, C. & Y. R. Co., 342 U.S. 359, 72 S.Ct. 312, 96 L.Ed. 398 (1952) (Federal law held to govern releases of claims under the F.E.L.A.).

The Court in Zenith gave an extensive history of the various rules that have evolved concerning the release of one joint tortfeasor by an injured party and what rights remained against other joint tortfeasors who were not parties to the release. In discussing these rules, the Court stated: (401 U.S. at p. 343, 91 S.Ct. at p. 808, 28 L.Ed.2d at pp. 95–97).

"Three rules have developed to deal with the question whether the release of·one joint tortfeasor releases other tortfeasors who are not parties to or named in the release. The ancient common-law rule, which was grounded upon a formalistic doctrine that a release extinguished the cause of action to which it related, was that a release of one joint tort-feasor ·released all other parties jointly liable, regardless of the intent of the parties. See e. g., Western Express Co. v. Smeltzer, 88 F.2d 94, 95 (CA6 1937); American Ry. Express Co. v. Stone, 27 F.2d 8, 10 (CA1 1928); Barrett v. Third Avenue R. Co., 45 N.Y. 628, 635 (1871); Ellis v. Esson, 50 Wis. 138, 146, 6 N. W. 518, 519 (1880). While this Court has referred to this rule in cases where the· rights of the litigants were controlled by state or federal common law, see Chicago & Alton R. Co. v. Wagner, 239 U.S. 452, 456–457, [36 S. Ct. 135, 136–137, 60 L.Ed. 379, 381] (1915); United States v. Price, 9 How. 83, 92, 13 L.Ed. 56 (1850); Hunt v. Rhodes, 1 Pet. 1, 16, 7 L.Ed. 27 (1828); we are cited to no case where we have applied the rule to a statutory cause of action created under federal law. Indeed, we have expressly repudiated the rule. See Aro Mfg. Co. v. Convertible Top Co. 377 U.S. 476, 501 [84 S.Ct. 1526, 1539, 12 L.Ed.2d 457, 477] (1964). Cf. Birdsell v. Shaliol, 112 U.S. 485, 489 [5 S. Ct. 244, 246, 28 L.Ed. 768, 769] (1884). Moreover, in the lower federal courts, causes of action based upon federal statutes have generally been governed by one of the other two rules. The first of these rules provides that, although a release of one coconspirator normally releases all others, it will not have such an effect if a plaintiff expressly reserves his rights against the others. This rule, which has been adopted with some variation by statute in 21 States, by judicial decision in others, see, e. g., McKenna v. Austin, 77 U.S.App.D.C. 228, 233–234, 134 F.2d 659, 664–665

(1943) (announcing D.C. law); Riley v. Industrial Finance Service Co. 157 Tex. 306, 311, 302 S.W.2d 652, 655 (1957); and by the First Restatement, see *Restatement, Torts* § 885(1) (1939); has been applied in a number of antitrust cases. See, e. g., Miami Parts & Spring, Inc. v. Champion Spark Plug Co., 402 F.2d 83, 84 (CA5 1968); Twentieth Century-Fox Film Corp. v. Winchester Drive-In Theatre, Inc., 351 F.2d 925, 931 (CA9 1965); Dura Electric Lamp Co. v. Westinghouse Electric Corp., 249 F.2d 5, 6–7 (CA3 1957). It was this rule that the Court of Appeals followed in the opinion below. A final rule, which has gained support in several recent decisions and been adopted by the American Law Institute in a tentative draft of the Second Restatement of Torts, provides that the effect of a release upon coconspirators shall be determined in accordance with the intentions of the parties. See Winchester Drive-In Theatre, Inc. v. Twentieth Century-Fox Film Co., 232 F.Supp. 556, 561–563 (ND Cal 1964), rev'd, Twentieth Century-Fox Film Corp. v. Winchester Drive-In Theatre, Inc., *supra*; Young v. State, 455 P.2d 889 (Alaska, 1969); Breen v. Peck, 28 N.J. 351, 146 A.2d 665 (1958); *Restatement (Second), Torts* § 885(1) (Tent.Draft No. 16, 1970); 12 Vand. L.Rev. 1414, 1416–1417 (1959).

We recently adopted the final rule giving effect to the intentions of the parties in Aro Mfg. Co. v. Convertible Top Co., *supra*, a patent infringement case. The agreement in that case expressly provided for the release of 'Ford, its associated companies . . . [and] its and their dealers, customers and users for its and their products' from all past and future infringement claims. 377 U.S., at 493 84 S.Ct. 1526, at 1536, 12 L.Ed.2d at 472]. The document, however, did not expressly reserve the releasor's rights against anyone. The issue in the case was whether Aro, a contributory infringer which did not fit within any of the special categories enumerated in the release, was nonetheless liable for its past contribution to infringements. The District Court had found that the parties had not intended to release contributory infringers such as Aro, and, despite the absence of an express reservation of rights against such infringers, we accordingly held that Aro was not entitled to benefit from the release. We concluded that a release, 'which clearly intends to save the releasor's rights against a past contributory infringer, does not automatically surrender those rights.' Id., at 501 [84 S.Ct. 1526, at 1540, 12 L.Ed.2d at 477].

We perceive no reason to follow a different rule in antitrust litigation. Indeed, of the three available rules, the rule adopted in Aro is most consistent with the aims and purposes of the treble-damage remedy under the antitrust laws. We must keep in mind the multistate and multiparty character of much private antitrust litigation; often, defendants who have conspired together must be sued in a number of different States if all are to be reached, and, while defendants in some States may be willing to enter into settlements, defendants in others may not. To adopt the ancient common-law rule would frustrate such partial settlements, and thereby promote litigation, while adoption of the First Restatement rule would create a trap for unwary plaintiffs' attorneys. The straightforward rule is that a party releases only those other parties whom he intends to release. Our conclusion that this is the appropriate rule for giving effect to releases under the antitrust laws is further buttressed by the Restatement's abandonment in a tentative draft of the rule requiring express reservation of rights in order to save them, and its adoption of the rule to which we adhere. See *Restatement (Second), Torts* § 885, Comments a–d (Tent. Draft No. 16, 1970).

The intention of the parties to the 1957 release is absolutely clear from the contract made prior thereto in which they agreed to exchange releases. That contract expressly provided for releases 'to bind or benefit' the party and 'the parent and subsidiaries of the party giving or receiving such release ("subsidiaries" to include corporations in which the party has stock ownership of 50% or more).' We accordingly have no hesitancy in holding that HRI, which was neither a party to the 1957 release nor a parent or subsidiary of a party, is not now entitled to the benefits of that release."

Our situation is quite different from that in the *Zenith* case. In *Zenith*, the prior settlement and release covered antitrust violations which the Plaintiff had alleged against other coconspirators. The Court held that the release of the prior joint tortfeasors did not bar Zenith's action against Hazeltine since Zenith did not intend to release any conspirators other than those stated in the release. In the action before this Court, the release was meant to cover any actions arising out of and/or concerning the franchise sales contract.

In June of 1962, Stanley Novak initiated an action against Union Carbide in the District Court for the District of New Jersey, alleging a Robinson-Patman Act violation by Carbide in the selling of "Prestone" antifreeze to certain competitors at different prices than the price charged to the plaintiffs. Carbide asserted a cost justification defense for the difference, and the case was called for trial. The parties then entered into settlement negotiations which resulted in an agreement whereby Carbide would pay the plaintiffs $5,000.00, in return for dismissal of the suit with prejudice and the execution of a release for the benefit of Carbide by the plaintiffs. A year and a half later, Novak alleged price discrimination against General Electric Corporation and Union Carbide in the sale of minature, sealed beam lamps in violation of the Clayton, Robinson-Patman, and Federal Trade Commis-

sion Acts. Both General Electric and Carbide moved for summary judgment asserting that the release precluded the suit. In an opinion entered in the second action, Novak v. General Electric Corporation, 282 F.Supp. 1010 (E.D.Pa. 1967), Judge Higginbotham stated the following (at pp. 1013 and 1016):

"At the threshold we are met with a difficult problem. 'Federal law is generally interstitial in its nature. It rarely occupies a legal field completely, totally excluding all participation by the legal systems of the states. * * * Federal legislation on the whole, has been conceived and drafted on an *ad hoc* basis to accomplish limited objectives. It builds upon legal relationships established by the states, altering or supplanting them only so far as necessary for the special purpose. * * *'

The antitrust statutes themselves provide no rule for interpreting releases of antitrust claims as to either what claims or what parties are released. Yet, as petitioners urge, since the issue involves the alleged release of a federally created right, it is a 'federal question' and one which the federal courts must be *competent* to answer without regard to state law. Thus, Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), Klaxon v. Stentor, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), and the cases which followed them, holding that a federal district court in a suit based on diversity of citizenship jurisdiction *must* apply the same rules for decision as would a state court in that state, are inapplicable.

On the other hand, federal courts are not bound to create a new rule for decision of every aspect of every 'federal question'. To the contrary, they should consider the problem, as Congress must have done when it enacted the relevant legislation, in the light of the existing body of state law. Indeed they may even choose to apply the state rule directly. Reconstruc-

tion Finance Corporation v. Beaver County, 328 U.S. 204, 66 S.Ct. 992, 90 L.Ed. 1172 (1946), cf. United States v. Yazell, 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966). The factors to be considered in making this choice are similar to those which determine knotty issues of statutory construction when legislative history is unhelpful:

1. The requirement—if any—of the federal program for a single rule for decision to be applied uniformly throughout the country.

2. The relationship of the transaction in question to the normal course of activities regularly decided under state law.

3. The relationship of the state rule to the federal policy and to related aspects of the federal program of which the statute in question is a part.

"\* \* \* [T]he problem involves more than merely arriving at one or another substantive rule for decision, but deciding whether to formulate \* \* \* a rule at all or to refer the determination to state law. \* \* \* In the present context, this would involve consideration not only of the best substantive result on the particular issue, but also balancing against the possible gain from prescribing such a rule, the potential losses from non-integration of the national program with normal state activities.'

\*    \*    \*    \*    \*    \*

"In the instant case, however, I am faced with the alternative of developing a set of rules for the interpretation of contracts releasing antitrust claims or of adopting the state rules. State law regularly treats cases involving the interpretation of contracts and attorneys draw contracts in the light of their knowledge of this entire body of rules. Unless those rules contravene the federal policy, there is no need to create a superseding body of federal common law, and I deem it unwise to do so."

Judge Higginbotham reasoned further that the law of New Jersey concerning releases supports the underlying Federal policy of "vigilant enforcement of the antitrust laws through the instrumentality of the private treble-damage action." He concluded that:

"While the federal policy of jealously regarding the rights of private antitrust claimants should not as a matter of law preclude their being able to release claims—even unknown claims —nor protect them, after-the-fact, from their conscious though unwise action, we think it does allow—and is supported by—a rule which requires the court to determine that they *knew and intended* that the release cover all that it is being held to cover. The question of the parties' intent as to the scope of the release is one of fact not readily ascertained on a motion for summary judgment; but which should be determined by the trier of fact after a full hearing."

After a full hearing on the matters presently before this Court, we can only conclude that the question of anti-trust claims was not within the contemplation of either party at the signing of the Release.

We believe that we are buttressed here by the approach taken by Judge Ruggero Aldisert in the case of In Re F. H. McGraw & Company, 473 F.2d 465 (3rd Cir. 1973), where the lower court had affirmed an order of the Referee in Bankruptcy disallowing the proof of a claim. F. H. McGraw & Company, a general contractor for the construction of a manufacturing plant for the Fellows Corporation, filed a Petition in Bankruptcy and a Receiver was appointed. In order to prevent delay and weather damage, Fellows elected to complete the construction itself by assuming the responsibility for paying the subcontractors and materialmen. After Fellows' counsel obtained the Receiver's consent to such an arrangement, the Receiver suggested that the parties utilize a Petition and Order form similar to an

arrangement previously entered into between the Receiver and another corporation. After examining the submitted form, Fellows consented to the form of Petition and Order and authorized the Receiver to proceed. The Receiver made the presentation to the Referee including an order providing for waiver of notice provisions of the original construction contract and the payment of materialmen and subcontractors by Fellows. Additionally, the order contained the following paragraph:

"And it is further ordered and decreed that Philip F. Newman, Esq., Receiver herein, shall not be liable for any claim for deficiency if the costs of completion of the contract exceed the balance of the contract price."

At the time the order was entered, both Fellows and the Receiver anticipated that the contract would be completed at a profit. However, according to Fellows' proof of claim, the cost of the completion exceeded the contract price by more than a million dollars, an amount which Fellows sought to assert as an unsecured claim in the bankruptcy proceedings. The Referee ruled that Fellows was estopped from denying the plain meaning of the release and, thus, the Receiver was relieved of liability by the agreement. It was uncontradicted that the parties did not discuss the language of the release, but that the language was included therein only by the ex parte action of the Receiver. The Referee ruled that "the only reasonable meaning that can be given to the release language is that the release inured to the benefit of the Trustee following adjudication." Judge Aldisert in reversing stated (at p. 468):

"Under the circumstances herein presented—where there is no evidence of prior discussion between Fellows and the receiver as to the inclusion of this language, let alone the drastic consequences flowing therefrom now urged upon this court—we are unwilling to attribute to this language the full force and effect of a bar to claims not matured or accrued at the time of the writing.

Although posited in another context, we are impressed by the approach of the Pennsylvania Supreme Court, speaking through Justice Roberts, in Restifo v. McDonald, 424 Pa. 644, 230 A.2d 199, 201 (1967):

A long line of Pennsylvania cases has held that a release covers only those matters which may be fairly said to have been within the contemplation of the parties when the release was given. See, e. g., Wenger v. Ziegler, 424 Pa. 268, 226 A.2d 653 (1967); Brill's Estate, 337 Pa. 525, 12 A.2d 50 (1940); Flaccus v. Wood, 260 Pa. 161, 103 A. 549 (1918); Shepley v. Lytle, 6 Watts 500 (1837); General Mills, Inc. v. Snavely, 203 Pa.Super. 162, 199 A.2d 540 (1964); Cockcroft v. Metropolitan Life Ins. Co., 125 Pa.Super. 293, 189 A. 687 (1937). Accordingly, the general words of the release will not be construed so as to bar the enforcement of a claim which has not accrued at the date of the release. See Henry Shenk Co. v. City of Erie, 352 Pa. 481, 43 A.2d 99 (1945); Zurich General Acc. & Liab. Ins. Co. v. Klein, 181 Pa.Super. 48, 55–60, 121 A.2d 893, 896 (1956).

Cady v. Mitchell, 208 Pa.Super. 16, 220 A.2d 373 (1966), is a recent illustration of the rule mandating strict construction of a release so as to void the ever present possibility that the releasor may be overreached. Cf. Wenger v. Ziegler, supra; Henry Shenk Co. v. City of Erie, supra; compare Linda Coal & Supply Co. v. Tasa Coal Co., 416 Pa. 97, 100, 204 A.2d 451, 453 (1964).

This court cannot be said to differ with Professor Williston's suggestion that '[w]herever a bargain is intended to operate in the future as an exemption from liability the courts apply more stringent rules of interpretation. . . .' Williston, supra, § 1826.

*See, e. g.,* Gimbel Brothers Inc. v. Vanderherchen, Inc., 468 F.2d 597 (3d Cir. 1972); Davis v. United States Gypsum Co., 451 F.2d 659 (3d Cir. 1971); Neville Chemical Co. v. Union Carbide Corp., 422 F.2d 1205, 1216 (3d Cir. 1970). Moreover, it cannot be said that we would follow a rule contrary to that of Pennsylvania which mandates strict construction of a release.

'This is not to suggest, however, that where there is specific, as distinguished from general, language, in an instrument, or under circumstances where the intent of parties is clearly demonstrated, that we would not give full force and effect to a release which operates as an absolute bar to recovery. We hold merely that under the circumstances presented to the referee, he should have found the language to be ambiguous. And, recognizing the principle that ambiguous language will be resolved against the author thereof, and mindful of the desirability of strict construction of a release from claims not yet accrued or matured, the referee should have allowed Fellows' claim as a general, unsecured creditor."

See also: Wm. A. Smith Contract. Co., Inc. v. Travelers Indem. Co., 467 F.2d 662 (10th Cir. 1972) (applying Pennsylvania law); Davis v. United States Gypsum Company, 451 F.2d 659 (3rd Cir. 1971); Ohio Cas. Ins. Co. (Venango F. S. & L.) v. Bank Bldg. & Eq. Corp., 300 F.Supp. 632 (W.D.Pa.1968).

In the instant situation there was no "whereas" clause to the effect that the parties desired to settle difference between them, as well as "all other manner of action or actions, cause or causes of action", etc. Instead, there was a recital of a consideration of one dollar, and Ford was to provide substantial dealer development funds to East Hills Ford, so East Hills could purchase the property of Three Rivers. Three Rivers then discharged Ford from all manner of actions. While not applying Pennsylvania law, but rather the applicable Federal law, we hold, in light of the evidence that there was no prior discussion between the parties as to the possibilities of any anti-trust violations, nor any discussion pertaining to the drastic consequences which might flow from that application of the language of the release. This Court is unwilling to attribute the full force and effect of the language to constitute a bar to this antitrust proceeding.

In Vines v. General Outdoor Advertising Co., 171 F.2d 487 (2nd Cir. 1948), a salesman of Outdoor Advertising sued his former employer for compensation for services rendered. He was to be paid on a compensation basis, and the employment contract provided that any accounts assigned to the Plaintiff for solicitation might be withdrawn by the employer at any time prior to an actual sale, in which event, the right to compensation for work on the withdrawn account would cease. The Plaintiff claimed loss of compensation for the withdrawal of one of his accounts, Liebmann Breweries, alleging it was brought about because of a contract between the employer and Outdoor Advertising which had been declared to be a violation of the anti-trust laws. Plaintiff did not know of these facts until after his suit for compensation had been instituted. He claimed damages under the anti-trust laws. The Defendant pleaded a release of "all claims and demands of any kind whatsoever to the date hereof, and particularly . . . any claims or demands for salary, commission or other compensation under any employment or contract of employment . . . " The District Court dismissed the complaint but the Second Circuit (per Learned Hand, J.) reversed, saying (at p. 492):

"Although the plaintiff says that on April 8th, 1941, he did not know that the transfer of the Liebmann Breweries had been made in pursuance of an illegal contract between the defendant and Outdoor Advertising Co., Inc., that ignorance might not alone be enough to avoid the release, had it contained only the general words.

Moreover, the fact that words of general import were followed by particular instances, did not inexorably leave no scope to the words of general import. In releases, as elsewhere, the intent of the parties is to be gathered from the instrument as a whole. Nevertheless, the courts of New York accept the common law doctrine that in a release words of general import, followed or preceded by words relating to specific claims, are, ceteris paribus, limited to the specific claims. For the present, we need say no more than that the release of April 8th, 1941, did not inevitably release claims which the plaintiff might have under the Anti-Trust Acts, of which he was ignorant at the time. . . ."

In Walder v. Paramount Publix Corporation, 132 F.Supp. 912 (S.D.N.Y. 1955), the former owners of a motion picture theater sued a motion picture distributor for treble damages in an injunction under the anti-trust laws; the distributor asserted as a defense a release governed by Florida law. The Court held the release insufficient to support a summary judgment for the distributor and set forth as follows (at pp. 916–917):

"There are general clauses in the release sufficiently broad to bar the plaintiffs' present claims. However, the first 'whereas' clause suggests a narrower scope. It states that the parties have had dealings and transactions relating to the 'Tivoli Theatre and its equipment' and that disputes have arisen 'with reference thereto and otherwise'. The defendants, in addition to the general clauses rely on the words 'and otherwise', but the 'whereas' clause read as a whole appears to imply a more limited scope than that for which they contend. Whether the release was limited to the claims relating to equipment and repairs or was sufficiently broad to encompass all claims arising out of the operation of the theatre including antitrust violations, is not altogether clear from the face of the document.

In view of this ambiguity the intention of the parties becomes relevant. Thus a substantial issue of fact exists which requires the denial of the motion for summary judgment."

In the present case, it is noted that not only did the release specifically refer to the purchase of Three Rivers' property by East Hills through the cooperation of Ford, but there was also a specific exception with respect to matters concerning the liability of Three Rivers on a warranty of products which was to be reassumed by Ford. There was also excluded a lawsuit by Eazor Trucking Company against Three Rivers filed in the Court of Common Pleas of Allegheny County, Pennsylvania, relating to a warranty situation.

Counsel for Ford cites to this Court the case of Fabert Motors, Inc. v. Ford Motor Company, 355 F.2d 888 (7th Cir. 1966), in which there was a two count complaint for violation of the antitrust laws and the Automobile Dealers' Franchise Act. The District Court granted Ford's motion for summary judgment. Plaintiff there asserted that pursuant to a conspiracy to combine Edsel and Lincoln-Mercury Dealerships, Ford coerced its Lincoln-Mercury Dealers into accepting the competitive Edsel Agencies or relinquishing their Lincoln-Mercury Dealerships. The Plaintiff alleged that it did not wish to accept the Edsel Agency and, thus, was forced to submit its resignation, and was economically coerced into a signing a general release on pain of forfeiting certain payments for merchandise, equipment and rental of the dealership premises in which the Plaintiff had made large investments. While the Court in that case held that the Plaintiff's general release barred the action, it is not at all apparent what law the Court applied. There were two cases cited in support: Duffy Theatres v. Griffith Consol. Theatres, 208 F.2d 316 (10th Cir. 1953) and Clarke Baridon, Inc. v. Merritt-Chapman & Scott Corp., 311 F.2d 389 (4th Cir. 1962). We do not think that the Duffy case is authority in our situation because the Court

there held that the comprehensive language of the release had to be construed by that Court as including all claims in existence at the time the contract was executed, except those specifically excluded. The Court argued that if any other existing liability was intended to be excepted, it should have been expressly set forth in the release. The exception of two claims from the release was held to indicate the intent of the parties to include all claims in existence at the time the contract was executed. In the instant case, as we have seen, we believe the meaning of the release to be ambiguous initially as to whether or not there was anything included except matters relating to the sale and disposition of various assets. Nor is the *Baridon* case any better authority for Ford's contention here, for in that case, the Court found the clear intent of the parties was to settle all matters other than two which were specifically reserved, and consequently held that the release prevented a later suit. Again, we do not believe such clear intent was evidenced by the release formulated by Ford in the instant case.

We further believe that *Fabert* itself can be distinguished. In *Fabert,* the Court held that the decisions of Ford to combine Lincoln-Mercury and Edsel Dealerships was an independent business decision free of any anticompetitive purpose. The Plaintiff could accept or reject Ford's decision; if he rejected it he could then sell his franchise, which he did. The Plaintiff claimed that if he knew that the Edsel was going to be such a short-lived model, he would never have sold his dealership. The Seventh Circuit found that no combination or conspiracy existed which would be essential to prove an anti-trust violation; the Court further held that in any event, the release being a general release barred all claims set for in the complaint. Although we agree with the holding in *Fabert,* we do not think that rationale is available here since if Ford's only activity was to establish Dealer Enterprise Stores, certainly such *per se* would not

be violative of anti-trust laws; here, however, the Plaintiff alleges further activities on the part of Ford in which a jury could find anti-trust violations. If the Plaintiff simply alleged that the competition with the Company owned stores caused him to sell his franchise (such stores being treated equally with the private owned dealerships by the manufacturer), then perhaps we might fall squarely on point with *Fabert.* Here, however, it was more than the competition with the factory owned stores which the Plaintiff alleges, but also the preferential treatment which the manufacturer gave to the factory owned store. Certainly, there is no evidence to show that Plaintiff had any awareness of this at the time he sold back his dealership to Ford. Extensive cross-examination of Mr. Winterhalter elicited the following:

"Q Okay. But you remember attending a meeting, even if you can't remember the date, when the subject matter of the meeting was to protest to Ford about the use of company stores and particularly Triangle Motors on Baum Boulevard; that was a subject that was discussed at these dealer meetings, wasn't it?

A Dealer meetings?

Q Yes. Well, let me show you the agenda for that meeting, and you are shown to have been present.

MR. SEAMANS: May I have a copy of that exhibit, please? We will have that in just a moment. Maybe I can show you the one I have until we find the one out of the book.

Q Do you recognize this as the agenda of a meeting of the Allegheny Ford dealers held on January 24, 1967, at 10:30 a. m. at the Chartiers Country Club, which states a whole series of items to be discussed under company stores, which refers for example to Triangle. That's the one on Baum Boulevard.

This was a subject, Mr. Winterhalter, that the dealers had strong feelings about and was discussed at your dealer meetings, wasn't it?

A It could be. I don't recall back in 1967, sir.

Q But regardless of when it happened, this is something you all beefed about, you didn't like it, and you discussed it frequently, the question of Ford having company stores which you thought were in competition with you and specifically you discussed the fact that Triangle on Baum Boulevard was a company store, isn't that right?

A Are you talking about dealer owned company stores? Is that what you are referring to?

Q What do you mean by company stores in your complaint? What did you mean by company stores and what did you mean when your counsel said you didn't know anything about company stores until the decision in the Rea Case?

Do you agree to that, that you had never heard of company stores? You didn't know that Triangle Motors was a company store until after the decision in the Rea case? Is that a fact, Mr. Winterhalter?

A I would say this to you, sir, to be honest, I don't see how anybody can say that they knew a hundred per cent whether it was company owned or not. I did not look at their stock certificates. I didn't look at the minutes or anything else. I can't answer that.

Q All right, sir. Now, may I show you, please, sir—

MR. SEAMANS: I will have this marked as an exhibit. It has been marked Defendant's Exhibit 39. Did you give to copy to Mr. Beamer, please?

Q I am going to show you some papers marked Defendants' Exhibit 39, and in there is a paper that reads as follows, dated January 24, 1967: We, the following Allegheny Ford Dealers, are resolving as a group to resign as a group our contracts under paragraph 21 and 22 of the Ford Motor Company sales agreement unless Ford Motor Company will eliminate company owned and operated stores in Allegheny County, and there is you name, is it not?

A That's there, yes.

Q All right. Do you recall this?

A No, I don't, sir.

Q I see. And at that very same meeting, this agenda that I have shown you does deal with company stores, for example, Triangle. Do you recall that was the agenda for that meeting?

A Triangle was discussed. I remember discussing it, sure. I won't say at that particular meeting. I can't answer that.

Q All right. But the fact that Ford had company stores, however you want to define them, and that they owned or operated Triangle and others was a subject that you knew about and was discussed certainly as long ago as 1967, isn't that a fact?

A They had company stores across the country, sure, they did.

MR. SEAMANS: Just to conclude on that item, your Honor, and I will move on.

Q Shortly after this meeting on January 24, 1967, you had another one on February 22, 1967, at the Webster Hall Hotel, did you not, where all the dealers were present, including Edward C. Rea of 22 Ford sales and William A. Winterhalter of Three Rivers Motors Company, and the whole subject of debate and discussion there between the Ford people

and the dealers was this question of company stores, including Triangle Motors, isn't that a fact?

A  Could be, yes, sir."

The conclusion we reach is that if the anti-trust violation was the competition with the factory owned stores, of which the Plaintiff was aware at the signing of the release, then the anti-trust action could well be barred by the release. It is the unfair competition, unknown to the Plaintiff at the time of the execution of the release here which distinguishes the *Fabert* holding, and necessitates our holding here that the release does not constitute a bar to this anti-trust action.

The Defendants rely on Virginia Impression Products Co. v. SCM Corporation, 448 F.2d 262 (5th Cir. 1971), to the effect that a general release bars a subsequent anti-trust action. In *Virginia Impression*, the Court applied Virginia law, and it is noteworthy to point out that the defendant hired a lawyer to negotiate the settlement agreement for the specific purpose of preventing a subsequent anti-trust action, and that the Plaintiff knew at all times all of the material facts which surrounded the general release. This is not the case in the situation presently before this Court.

Winterhalter was aware of the competitiveness of the Ford owned dealerships with the privately owned dealerships; he was not aware, and nowhere in the transcript is it established that he was aware, of the practices and agreements between Ford and its wholly owned or controlled dealers. His reason for wanting to sell was because he was losing money as a result of competition. Certainly, the anti-trust practices alleged in the Complaint, if proven at trial, were not within the knowledge or contemplation of the parties at the signing of the Release. If the Court applies either the law of Pennsylvania or Federal law, the result would be the same and the aforementioned Release must be set aside.

Therefore, after a careful review of the Release, the activities leading up to the sale of Three Rivers, the facts known to the parties and the applicable principles of law, we can only conclude that the Release must be set aside and can not bar the present anti-trust action.