# Colonial Trust Company, Administrator, Appellant, v. Hoffstot.

*Bailment—Pledgor and pledgee—Borrower and lender—Confidential relation—Fiduciary relation.*

Where the relation between the parties to a bill in equity is that of borrower and lender, and as to the collateral for the loan, that of pledgor and pledgee, the relation is not a confidential relation, and not in any but a very limited sense, if at all, a fiduciary relation, and in such a case there is no reason why the parties should not deal freely with each other in regard to the property held in pledge.

The fact that the lender undertook and did in fact, not only advance money to the borrower, but assisted him in financing his affairs, and in pursuance thereof, through an agent, took part in the management of his business, does not change the status of the parties towards each other.

*Contract—Insanity—Mental depression—Suicide—Equitable duress.*

Where a man during a period of nervous depression from financial troubles, in which he is brooding over the idea of suicide, makes a contract, and thereafter actually commits suicide, the mere fact of suicide without other evidence, is not sufficient to support a finding that he was non compos mentis at the time he made the contract; and much more is this so where there is a large amount of evidence that he personally attended to many and diversified corporate interests with no hint from any business connection or associate of his incompetency, or even of impaired keenness. Insanity is not a legal deduction from suicide.

Where a man during a state of nervous depression resulting from desperate financial straits, but with full mental capacity, secures the loan of a large sum of money, and the lender to protect himself against the great risk involved, requires the borrower to transfer to him all of his assets as collateral for the loan, the lender cannot be charged with equitable duress in the transaction.

Argued Nov. 4, 1907. Appeal, No. 109, Oct. T., 1907, by plaintiffs, from decree of C. P. No. 2, Allegheny Co., April T., 1906, No. 1,174, dismissing bill in equity in case of The Colonial Trust Company, Administrator of the Estate of W. C. Jutte, deceased, Jane C. Jutte, and Mercantile Trust Co., Guardian, v. F. N. Hoffstot and James W. Friend. Before MITCHELL, C. J., FELL, BROWN, MESTREZAT, POTTER and STEWART, JJ. Affirmed.

498 COLONIAL TRUST CO., Appellant, *v.* HOFFSTOT.

Bill in equity for an account.   Before SHAFER, J.

The facts are stated in the opinion of the Supreme Court.

*Error assigned* was decree dismissing the bill.

*A. Leo Weil*, with him *B. M. Ambler, Wm. M. Galbraith* and *Charles M. Thorp*, for appellants.—The contracts were made by defendants with Jutte while they occupied to him a confidential relation : Darlington's Est., 147 Pa. 624 ; Miskey's App., 107 Pa. 611 ; Stepp v. Frampton, 179 Pa. 284 ; Dunn v. Dunn, 42 N. J. Eq. 431 (7 Atl. Repr. 842).

Advantage was taken by defendants of Jutte's financial embarrassment and frantic condition to drive with him a grossly extortionate and unconscionable bargain, Jutte being at the time and all the time under equitable duress to defendants.

Even if Jutte in his extremity was compelled to submit to whatever terms the defendants might demand, a court of equity will not permit advantage to be taken of this extremity to enable defendants to extort from him an unconscionable and oppressive agreement : Story, Eq. Juris. sec. 188 ; 1 Page on Contracts, sec. 234 ; Miller v. Miller, 68 Pa. 486 ; McAllister's App., 59 Pa. 204 ; Huguenin v. Baseley, 2 Lead. Cases in Equity, *556.

Mr. Jutte was mentally weakened when he made these contracts, and so continued until his death : McElroy's Case, 6 W. & S. 451 ; Lancaster County Natl. Bank v. Moore, 78 Pa. 407 ; Nace v. Boyer, 30 Pa. 99 ; Longenecker v. Church, 200 Pa. 567 ; Allore v. Jewell, 94 U. S. 506 ; Harding v. Wheaton, 2 Mason, 378 ; Smee v. Smee, L. R. 5 P. D. 84 ; Boyse v. Rossborough, 6 H. L. Cas. 2 ; Dew v. Clark, 3 Addams, 79 ; Thornbrough v. Baker, 2 White & Tudor, L. C. 1984 ; Stepp v. Frampton, 179 Pa. 284 ; Allore v. Jewell, 94 U. S. 506 ; Maddox v. Simmons, 31 Ga. 512 ; Cruise v. Christopher, 5 Dana (Ky.), 181 ; McCormick v. Malin, 5 Blackf. (Ind.) 509 ; Cobb v. Day, 106 Mo. 278.

*James H. Beal*, of *Reed, Smith, Shaw & Beal*, with him *Chas. Gibbs Carter*, for appellees.—There can be no relief on the ground of confidential or fiduciary relation, because (a) it was not set up in the bill, and (b) there was no proof of any

such relation: Greenfield's Estate, 14 Pa. 489; Clark v. Everhart, 63 Pa. 347: Geddes's App., 80 Pa. 442; Allcard v. Skinner, L. R. 36 Ch. D. 145; Knight v. Marjoribanks, 48 Eng. Ch. Rep. 10; Conley v. Nailor, 118 U. S. 127; Dean v. Fuller, 40 Pa. 474.

OPINION BY MR. CHIEF JUSTICE MITCHELL, January 6, 1908:

This case involves the review of financial transactions between borrower and lender. Except for the large amounts dealt with, the complication of the transactions, and certain sensational features having no real bearing on the law or the merits of the case, it does not differ from the common run of such cases. The general subject of the litigation is thus clearly summed up by the learned judge below before whom the case was tried: " The bill is for an injunction to restrain the sale by the defendants of collateral of plaintiffs' decedent for a debt alleged to be due from him under certain contracts; to set aside those contracts as being made while decedent was insane, and as being unconscionable and oppressive, and for a receiver and an account.

" The trial of this case lasted many weeks, the testimony taken amounting to nearly 4,000 pages, in addition to over 300 exhibits, some of them quite voluminous, forming a record of a volume believed to be unprecedented in the courts of this county. The trial was conducted with elaborate care and great skill on both sides, and was prolonged by the great complication of decedent's affairs, the general situation of which at various times was deemed an important element in the determination of the matters in issue."

The main facts which are found in detail by the learned judge below, are that Jutte prior to 1899 had been engaged for many years in mining and shipping coal, with which business he was entirely familiar. In 1899 he and others joined in forming what is called for convenience the River Coal Company, sold to that company for a large price their plants, including goodwill, etc., part of the consideration being his agreement not to engage in the same business within the territory where the coal company operated for a period of ten years. Being disappointed in his expectation of becoming an officer of the coal company he promptly disregarded his

agreement not to engage in the business (see Monongahela etc., Co. v. Jutte, 210 Pa. 288) and in 1900 started a rival corporation, with subordinate auxiliary companies, in which he and others including the defendants put large amounts of money for the purchase of coal lands, river barges, a landing on the Monongahela river, etc. The operations were on a large scale, but not presently remunerative. The result was that in the fall of 1901 his affairs were greatly involved. His assets were large, but nearly all pledged for indebtedness which was rapidly maturing, and his creditors were pressing for payment. As found by the court below, his own liabilities exceeded his assets from $200,000 to $300,000, while C. Jutte & Company owed on bills and accounts payable about $281,000, to meet which they had in cash, bills receivable, coal, coal barges, etc., about $275,000, and owned the Gilchrist float and an interest in the Marine Coal Company, worth together about $115,000, making their margin of assets over liabilities about $109,000. The business of C. Jutte & Company was the income producer on which as a going concern the salvation from bankruptcy of the connected operations depended.

In this situation of his affairs, complicated by his indictment in West Virginia for forgery in connection with some papers concerning a bridge company, which though subsequently quashed, worried him greatly, Jutte applied to defendants for aid, and on November 5, 1901, made the first of a series of contracts between the parties which gave rise to this litigation.

By this contract defendants were to procure for Jutte a loan of $200,000 for a year to enable him to pay off his most pressing debts, and tide him over the crisis. For this he was to pay six per cent commission, six per cent interest, to put up all his industrial stocks and bonds as security, to give defendants one-half of whatever C. Jutte & Company should be worth after he should get back the money he had put into that concern, taking the amount, however, in bonds instead of cash, and in the meantime, a nominee of defendants, one Guffey, was to be taken into the employ of C. Jutte & Company, to look after the business and see that the securities were handled in accordance with the agreement.

Between this first contract of November 5, 1901, and May,

1903, four other contracts were made between the parties altering or supplementing the original terms, but none of them material to be dwelt upon now. The court below in its finding, No. 26, said: "The situation which confronted Jutte in May, 1903, would therefore appear to have been this: He had not succeeded in paying off any material part of the debts for which he had procured an extension. He had been and was obliged to pay interest on them. The extension would expire the next winter. He was unable to withdraw from any interest in which he was concerned any money to pay them or the interest on them, but, on the contrary, each enterprise in which he was concerned needed money. The success of C. Jutte & Company was absolutely necessary to prevent financial ruin. C. Jutte & Company could not be a success unless it got its coal opened and transported to the market upon a considerable scale. . . . It was, therefore, absolutely necessary that C. Jutte & Company should have more money with which to operate; and this could only be had, if at all, by the sale of its bonds. In order to get any sum of money worth while, it was necessary to make an issue of bonds of considerably over $1,000,000. The only substantial assets of C. Jutte & Company upon which a bond issue could be founded, were the steamboats and other craft on the river, the Neal landing and the Pike Run coal. . . . The coal itself furnished the principal basis of the loan. Now, even if the coal were supposed to have increased in value more than three times what Jutte paid for it, it, together with the other properties of C. Jutte & Company, would not make a very substantial basis for a loan of $1,000,000, and to sell bonds of an issue of $1,600,000, or any substantial sum over $1,000,000 on that property, on the market, was impossible."

The court then continues: "On May 12, 1903, the contract was made upon which the defendants claim the right to do that which the plaintiffs seek to enjoin. This contract is in the form of a letter from Jutte to Friend and Hoffstot, which was afterwards accepted by them. Although in this form it was undoubtedly agreed upon between the parties before it was written, and, therefore, while by its form it appears to be the words of Jutte only, yet in fact the words are equally those of each party. Bearing this in mind, the substance of

the contract may be stated as if in Jutte's words, and he says: 'I confirm the contracts heretofore made with you, referring to the contracts above mentioned, and I find I have not provided securities for C. Jutte & Company to obtain the necessary working capital, and I think its bonded indebtedness ought to be increased to $1,600,000. I want you to join me in surrendering the present issue of bonds and I will take $750,000 of the new issue, instead of that amount of the old and in order to get myself out of debt I wish to sell you this $750,000 of the new bonds at ninety cents on the dollar. I will use the proceeds to pay what I owe you, and apply the balance to the rest of my debts, and then I will make the division of securities heretofore agreed on. As to the $800,000 of new bonds that will be left, I wish you to sell them to Blair & Company, as I understand you can, at par, giving them $80,000 preferred stock of C. Jutte & Company and your personal guaranty to buy back the preferred stock at par and the bonds at 111 within three years, and I will indemnify you for this guaranty to Blair & Company, leaving with you all my real and personal estate as security, and if you have to make good your guaranty with Blair & Company, I authorize you to sell the bonds and stocks repurchased from them on ten days' notice. I am also to have the privilege of buying back $460,000 of the common stock of C. Jutte & Company at fifty cents on the dollar, at any time before April 1st, 1906.' The substance of the contract is that Friend and Hoffstot agree to buy outright Jutte's $750,000 of bonds at ninety cents on the dollar, and the new $600,000 of bonds from C. Jutte & Company at par, and Jutte guarantees them that this $600,000 of bonds and the $200,000 belonging to Friend and Hoffstot shall be worth 111 per cent on the market in three years, and that the $80,000 worth of preferred stock of C. Jutte & Company shall also be worth par."

These contracts, particularly the last, are attacked by the appellants, representing the interests of Jutte, on the grounds first, that a confidential fiduciary relation existed between the parties; second, that Jutte was of impaired and unsound mind; third, that advantage was taken of his financial distress, amounting to equitable duress, to extort oppressive and unconscionable agreements from him.

First, there was no confidential or fiduciary relation proved. The parties were borrower and lender, and in regard to the stocks, etc., as to which the bill seeks an accounting, the relation in which they stood, as found by the court below, was "that of pledgor and pledgee, which is not a confidential relation, nor in any but a very limited sense, if at all, a fiduciary relation, and furnishes no reason why the parties should not deal freely with each other in regard to the property held in pledge. No confidential or fiduciary relation between the parties was alleged in the bill or set up as a ground of relief." That defendants undertook and did, in fact, not only advance him money but assisted in financing his affairs, and in pursuance thereof did, through Guffey as agent, take part in the management of his business, does not change their status towards him. They were interested financially in his successful extrication from his pecuniary difficulties, and they worked for that result in his behalf as much as in their own. No act is shown which sustains any opposite view.

Second, that Jutte was non compos mentis in any material sense is even less tenable. That in the latter part of 1901 he was ill, nervous, dejected and brooding over the idea of suicide may be conceded. He made an attempt at suicide in 1901, and another successful one in 1905. But insanity is not a legal deduction from suicide. As the learned judge below said, he had at various periods the idea that suicide would be the best thing for him, "but this was not because he was insane but because of his knowledge of his financial situation. For a man in the situation in which he knew himself to be in the latter part of November, 1901, to commit suicide, is by no means unheard of. In May, 1905, when he committed suicide, he must have seen clearly that his affairs and the affairs of C. Jutte & Company were in such a state that there was no hope whatever of the bonds being worth 111, or anywhere near that amount, in less than one year from that time, and that upon his guaranty that they would be worth that amount he would lose everything he had." Apart from suicide the testimony as to insanity consists of the usual loose talk of relatives, physicians and acquaintances as to peculiarities of speech and action, such as always crops up on such issues, but rarely makes itself heard while the per-

504 COLONIAL TRUST CO., Appellant, *v.* HOFFSTOT.

son referred to is alive and treading his daily path of life. Against such flimsy evidence as this there is in the present case the indisputable fact that during the four years of these transactions, with the exception of short trips to the seashore and to Europe, for the benefit of his physical health, Jutte attended personally to his many and diversified corporate interests, with no hint from any business connection or associate of his incompetency or even of impaired keenness. As an illustration of the extent of his operations, it appears in the evidence that from day to day during the months of October and November, 1901, he made or indorsed twenty-eight promissory notes, amounting to $496,052.85, and during the same period drew checks, aggregating $273,712.09, on his individual account in one bank, besides keeping individual accounts in a number of other banks, as well as having charge of the bank accounts of five corporations. Not a single one of these acts was, or is now, challenged as showing impaired mental capacity. In the face of such facts the theories and opinions advanced are worthless.

Third, there was nothing amounting to equitable duress compelling Jutte to make unconscionable agreements. With the failure to show mental incapacity this part of the case falls almost of course. But there was no evidence that shows any such equitable duress as will permit a court to set aside an executed contract. The defendants carried out all their agreements as they had made them. No doubt they drove a hard bargain, but when did money lenders ever do otherwise when they were taking a dangerous risk? Jutte was a bold, skillful and for a time successful operator, who, like many another, finally let his boldness get the better of his discretion and brought himself to the end of his resources. The situation was desperate, but it was of his own creation, and no one saw it more clearly than himself. He went to the defendants for help, and securing themselves by all the available assets he had they gave him help, taking thereby a big risk for the chance of a big profit. It was a transaction such as the business world in which both parties moved is doing every day.

The learned judge below, after most patient hearing and consideration, filed an elaborate opinion which has greatly lessened our labors, and which would have been adopted in

full except for the fact that it naturally discusses details which, while of interest to the parties, have no legal importance to others and would, therefore, unnecessarily incumber the reports. The most careful review fails to shake any of his conclusions either of fact or of law.

The decree is affirmed at the costs of the appellants.