**THREE RIVERS MOTORS COMPANY**

v.

**The FORD MOTOR COMPANY and Auto Lite Corporation, Appellants.**

No. 74–1710.

United States Court of Appeals, Third Circuit.

Argued May 1, 1975.

Decided July 1, 1975.

John A. Metz, Jr., Henry G. Beamer, III, Metz, Cook, Hanna & Kelly, Pittsburgh, Pa., for appellee.

Frank L. Seamans, John H. Morgan, Edward G. O'Connor, David E. Tungate, Ray C. Stoner, Eckert, Seamans, Cherin & Melliott, Pittsburgh, Pa., for appellants.

Before FORMAN, Van DUSEN and GARTH, Circuit Judges.

## OPINION OF THE COURT

FORMAN, Circuit Judge.

This is an interlocutory appeal[1] from the refusal of the United States District Court for the Western District of Pennsylvania to apply a general release to bar a pending antitrust action by Three Rivers Motors Company (Three Rivers) against Ford Motor Company (Ford). The release, executed in favor of Ford by Three Rivers upon termination of its Ford franchise, was raised by Ford in the context of a Rule 12(b)(6), Fed.R. Civ.P., motion to dismiss the antitrust claim.[2] For the reasons set forth herein, it is held that the release bars Three Rivers' antitrust cause of action against Ford and, therefore, the District Court's ruling will be reversed and remanded with directions to grant Ford's motion to dismiss.

From 1951 to 1970 Three Rivers, first a Delaware and later a Pennsylvania corporation, operated under a Ford franchise in the Pittsburgh, Pennsylvania area with William Winterhalter serving as its president. Ford owned and operated a competing dealership in the same area under the name of Triangle Motors during at least part of this twenty-year span.[3] Three Rivers was aware of the Ford-owned dealership and also knew that the resulting competition was a factor contributing to Three Rivers' post-1965 operating losses. Prompted by these operating losses, Mr. Winterhalter began negotiating with Ford in 1966 in an effort to resign the Three Rivers franchise without sacrificing the corporation's investment in parts, accessories and equipment which at the time amounted to more than $120,000. Under the pre-1967 standard franchise agreement which Mr. Winterhalter and other Ford dealers had within the manufacturer, Ford had the option but not the obligation to repurchase Three Rivers' vehicles, parts inventory, etc. This repurchase of inventory stumbling block was apparently resolved in June 1967 when Ford unilaterally changed its franchise agreement to obligate Ford to buy back the inventory in return for the dealer's execution of a general release in a form specified by Ford. It is this general re-

1. Ford's petition for leave to appeal pursuant to 28 U.S.C.A. § 1292(b) was granted by another panel of this court. C.A. Misc. Record No. 74–8136.

2. The District Court's decision denying Ford's motion to dismiss the antitrust action and granting Three Rivers' petition to set aside the release is reported at 374 F.Supp. 620 (W.D. Pa.1974).

3. Ford's ownership of Triangle Motors was also the subject of an antitrust suit filed by 22 Ford Inc., another privately-owned dealership in the Pittsburgh area. See *Rea v. Ford Motor Co.*, 355 F.Supp. 842 (W.D.Pa.1973), *rev'd and remanded*, 497 F.2d 577 (3d Cir. 1974), *cert. denied*, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974).

lease which Ford now raises as a defense against the antitrust suit brought by Three Rivers.

Further problems, unrelated to the sale of inventory, delayed resignation of the Three Rivers franchise for several years. Finally, in early 1970 an agreement was reached and a closing was held where Three Rivers was to execute the general release and transfer its franchise and inventory to East Hills Ford, a new privately-owned dealership, in return for a total consideration of $524,000, part of which was supplied by Ford and part by East Hills. At the closing, Mr. Winterhalter balked at executing the general release, but after some negotiating between the parties' attorneys, he signed the release form, modified in a single respect—an exception was added to the release for a pending product liability suit filed by Eazor Trucking against Three Rivers and Ford.[4]

Three years later, in February 1973, Three Rivers filed the instant suit charging Ford with various antitrust violations arising, *inter alia,* from an alleged price-fixing arrangement which encouraged certain fleet customers to purchase their new vehicles from the Ford-owned dealership, Triangle Motors. The limited question presented by this appeal is whether the release signed by Three Rivers is written in language broad enough to encompass antitrust claims and, therefore, bars this action against Ford.

### Is the release to be interpreted by federal law or by state law?

While the antitrust cause of action is created by federal law, it does not necessarily follow that all issues in an antitrust case are to be determined by reference to federal law. *Dura Electric Lamp Co. v. Westinghouse Electric Corp.,* 249 F.2d 5, 6 (3d Cir. 1957); Cf. *Wallis v. Pan American Petroleum Corp.,* 384 U.S. 63, 67–72, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966); *United States v. Ya-*

*zell,* 382 U.S. 341, 348–58, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966). As explained in Hart and Wechsler, The Federal Courts and the Federal System (2d Ed. 1973):

"Federal law is generally interstitial in its nature. It rarely occupies a legal field completely, totally excluding all participation by the legal systems of the states. This was plainly true in the beginning when the federal legislative product (including the Constitution) was extremely small. It is significantly true today, despite the volume of Congressional enactments, and even within areas where Congress has been very active. Federal legislation, on the whole, has been conceived and drafted on an *ad hoc* basis to accomplish limited objectives. It builds upon legal relationships established by the states, altering or supplanting them only so far as necessary for the special purpose. Congress acts, in short, against the background of the total *corpus juris* of the states in much the way that a state legislature acts against the background of the common law, assumed to govern unless changed by legislation." Hart and Wechsler, The Federal Courts and the Federal System 470–71 (2d Ed. 1973).

Although Congress has explicitly occupied the antitrust field to the extent of legislating duties and causes of action for their enforcement, it has provided no rule for interpreting releases of antitrust claims. Thus, the question before this panel is whether federal common law or state law should be used to interpret the contract by which Three Rivers allegedly released its private antitrust cause of action.

Initially, it bears noting that the principles enunciated in *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and related decisions do not *compel* the application of state contract law in the instant case.[5] Al-

---

4. The release is set out in full in *Three Rivers Motors Company v. Ford Motor Company,* 374 F.Supp. 620, 621 n.1 (W.D.Pa.1974).

5. In its complaint Three Rivers alleged both diversity of citizenship and the existence of a federal question as grounds for federal juris-

though *Erie* does require that state law be applied in certain areas where law-making competence has been exclusively allocated to the states,[6] its mandate has no application to the resolution of questions affecting the federal antitrust statute. Since this case deals with the operation of a Congressional statutory scheme, the federal courts are *competent* to interpret the release without regard to state law. Cf. *United States v. Standard Oil Co.,* 332 U.S. 301, 307, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947); *Garrett v. Moore-McCormack Co.,* 317 U.S. 239, 245, 63 S.Ct. 246, 87 L.Ed. 239 (1942).[7]

■■ Having demonstrated that this court has the power to apply federal common law to interpret the release, it must be noted that we are also free to apply a state rule of law. *Reconstruc-* tion Finance Corp. v. Beaver County, 328 U.S. 204, 209–210, 66 S.Ct. 992, 90 L.Ed. 1172 (1946); *Clearfield Trust Co. v. United States,* 318 U.S. 363, 367, 63 S.Ct. 573, 87 L.Ed. 838 (1943). Since Congress has not enacted a federal law for interpreting antitrust releases nor has it indicated an intent to adopt state laws on the subject, this court must consider for itself whether the statutory policies embodied in the antitrust laws will be better promoted by the absorption of state laws regarding release or the formulation of a federal rule. Factors relevant to the balancing of these competing governmental interests include: the need for a uniform federal rule,[8] the extent to which the transaction in question fits within the normal course of activities regularly governed by state law,[9] and the possibility of the state rule frustrat-

diction. But even if only the federal question ground had been asserted, *Erie* would still have potential application. Applicability of the *Erie* doctrine is not dependent on the jurisdictional basis, even though it has most often been applied in cases where federal jurisdiction is based on diversity of citizenship. E. g. *Maternally Yours v. Your Maternity Shop,* 234 F.2d 538, 540–41 n.1 (2d Cir. 1956). See generally Hart and Wechsler, The Federal Courts and the Federal System 766–68 (2d Ed. 1973).

6. Whether this aspect of *Erie* derives from the Constitution or from federal statutes was a matter of dispute within the *Erie* Court itself, *compare* 304 U.S. at 79–80, 58 S.Ct. 817 (opinion of the Court) *with* 304 U.S. at 88, 58 S.Ct. 817 (Butler, J., concurring), and remains a subject of continuing debate. See Wright, Federal Courts § 56 and authorities cited in nn.15, 16 (2d Ed. 1970).

7. See also Mishkin, *The Variousness of "Federal Law": Competence and Discretion in the Choice of National and State Rules for Decision,* 105 U.Pa.L.Rev. 797, 798–801 (1957).

"Such competence is essential to the effective implementation of the legislative powers committed to the national government by the Constitution. To be sure, within the central structure, those powers are granted to the Congress, and, for various good reasons such grants cannot be taken directly to authorize judicial law-making of equal scope. At the same time, the separation of powers cannot be watertight; exclusive reliance upon statutory provision for the solution of all problems is futile. Beyond the

political realities which will at times compel congressional bypassing of any issue—thus leaving it open until pending litigation forces court resolution—lie such simpler pressures as shortness of time and, perhaps most important, the severe limits of human foresight. Together, these factors combine to make the concept of statutory enactment as a totally self-sufficient and exclusive legislative process entirely unreal. At the very least, effective Constitutionalism requires recognition of power in the federal courts to declare, as a matter of common law or 'judicial legislation,' rules which may be necessary to fill in interstitially or otherwise effectuate the statutory patterns enacted in the large by Congress. In other words, it must mean recognition of federal judicial competence to declare the governing law in an area comprising issues substantially related to an established program of government operation." *Id.* at 799–800 (footnotes omitted).

8. *U.A.W. v. Hoosier Cardinal Corp.,* 383 U.S. 696, 701–03, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966); *United States v. Standard Oil Co.,* 332 U.S. 301, 307, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947); *Clearfield Trust Co. v. United States,* 318 U.S. 363, 367, 63 S.Ct. 573, 87 L.Ed. 838 (1943); *Texas v. Pankey,* 441 F.2d 236, 241 (10th Cir. 1971).

9. *United States v. Yazell,* 382 U.S. 341, 352–58, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966); *Bank of America v. Parnell,* 352 U.S. 29, 32–34, 77 S.Ct. 119, 1 L.Ed.2d 93 (1956).

890

ing the operation of the federal statutory scheme.[10]

The need for uniformity arises when the various state laws, by their diversity, threaten to impede the efficient operation of the federal statute. As a practical matter, however, a judicially-created uniform rule may be difficult to attain. It has been observed that:

"[T]he fact is—presumably well known to the legal profession—that such complete uniformity may be most unlikely as a matter of common law development: the only court in a position to assure that degree of uniformity—the United States Supreme Court—is so burdened with its present work that it is highly improbable that it could undertake effectively to develop detailed substantive rules for any area we are here considering." Mishkin, *The Variousness of "Federal Law": Competence and Discretion in the Choice of National and State Rules for Decision,* 105 U.Pa.L.Rev. 797, 813 (1957).[11]

Nevertheless, several cases have found the need for uniformity sufficient to require implementation of a federal common law rule. In *Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), the Supreme Court held that the diversity of state commercial laws necessitated the development of federal common laws to govern commercial paper issued by the United States. A WPA pay check issued by the United States at Harrisburg, Pennsylvania was stolen and cashed by way of a forged endorsement. Clearfield Trust Company, a Pennsylvania bank, presented the check for payment to the Federal Reserve Bank in Philadelphia and collected the face amount. More than eight months later the United States notified Clearfield Trust that the endorsement was a forgery and instituted suit for re-

imbursement. Under Pennsylvania law, where all the relevant transactions took place, the delay in notifying the bank of the forgery would have prevented the United States from recovering the funds. The Court, however, declined to apply the state rule reasoning:

"The issuance of commercial paper by the United States is on a vast scale and transactions in that paper from issuance to payment will commonly occur in several states. The application of state law, even without the conflict of law rules of the forum, would subject the rights and duties of the United States to exceptional uncertainty. It would lead to great diversity in results by making identical transactions subject to the vagaries of the laws of the several states. The desirability of a uniform rule is plain." 318 U.S. at 367, 63 S.Ct. at 575.

In contrast, when two private parties bargain for a release, they are little affected by the diversity of state laws controlling the interpretation of releases. Even though the private antitrust cause of action is likely to involve multi-state and multi-party litigation, a release of that cause is nothing more than a contract negotiated between two or more of the private parties. Irrespective of the variation among state laws interpreting releases, the contracting parties can readily couch their release agreement in terms compatible with whichever state's law is applicable. Thus, a nationally uniform interpretation rule would have little utility. Its only effect would be to encourage the contracting parties to phrase their release in terms compatible with the national rule rather than with the law of a particular state.

The instant case is distinguishable from *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971), where the Supreme

---

10. *Johnson v. Railway Express Agency,* 421 U.S. 454, 465–467, 95 S.Ct. 1716, 1722–1723, 44 L.Ed.2d 295 (1975); *Wallis v. Pan American Petroleum Corp.,* 384 U.S. 63, 68, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966); *Dice v. Akron, C. &. Y.R. Co.,* 342 U.S. 359, 361–63, 72 S.Ct. 312, 96 L.Ed. 398 (1952).

11. See generally *Federal Judicial Center Report of the Study Group on the Case Load of the Supreme Court* (1972); Stern, *Denial of Certiorari Despite a Conflict,* 66 Harv.L.Rev. 465 (1953).

Court adopted a uniform national rule to govern the effect of a release on co-defendants in other states. Several companies were alleged to have jointly violated the antitrust laws resulting in injury to the Zenith Radio Corporation. One issue presented was whether Zenith's valid release of one of the conspirators operated to release the remaining conspirators. The Court noted a wide variety of state laws on the subject and decided that a uniform rule was needed to permit a plaintiff injured by an antitrust violation to settle its claim against defendants in one state without unintentionally releasing its claim against co-defendants in other states.[12] 401 U.S. at 346–47, 91 S.Ct. 795. Similar multi-state complications do not arise in interpreting the terms of the release.[13]

The application of state law to the interpretation of a contract will not come as a surprise to the contracting parties. State law customarily governs the field of contracts and it is to state rather than federal law that private parties are likely to refer when formulating the terms of a contractual release. See *Novak v. General Electric Corp.*, 282 F.Supp. 1010, 1016 (E.D.Pa.1967).[14] The instant release was signed in connection with the sale of a business and purported to broadly release "all . . . causes of action." The parties might be quite surprised indeed to learn that their language will be interpreted by state law in tort, product liability and other cases, but by federal common law in antitrust cases. Absent a substantial reason for

doing so, the law of private contracts should not be burdened with the complication of a separate federal rule for releasing an antitrust cause of action. Thus, the Supreme Court has stated:

"Both theory and the precedents of this Court teach us solicitude for state interests . . . . They should be overridden by the federal courts only where clear and substantial interests of the National Government, which cannot be served consistently with respect for such state interests, will suffer major damage if the state law is applied." *United States v. Yazell*, 382 U.S. 341, 352, 86 S.Ct. 500, 507, 15 L.Ed.2d 404 (1966).

■ Applying state law to interpret private antitrust causes of action will not frustrate the federal enforcement of antitrust violations. The private antitrust cause of action provided by 15 U.S.C.A. § 15 allows a person injured as the result of an antitrust violation to bring a private suit for treble damages against the violator. Congress enacted this private cause of action as a supplemental means for the enforcement of the antitrust laws, paralleling the public cause of action enforceable by the Government. *Byram Concretanks, Inc. v. Warren Concrete Products Co.*, 374 F.2d 649, 651 (3d Cir. 1967). Although there is an unquestioned public interest in the "vigilant enforcement of the antitrust laws through the instrumentality of the private treble-damage action," *Lawlor v. National Screen Service*, 349 U.S. 322,

---

12. In *Zenith*, the Court also rejected two of the three types of state rules on the subject for the reason that they would frustrate policies underlying the federal antitrust laws:

"To adopt the ancient common-law rule would frustrate . . . partial settlements, and thereby promote litigation, while adoption of the First Restatement rule would create a trap for unwary plaintiffs' attorneys." 401 U.S. at 347, 91 S.Ct. at 810.

13. "[A] decision to apply state law as a matter of federal judicial incorporation may frequently be made as to a single issue at a time . . . . Whether state law is to be incorporated as a matter of federal common

law . . . involves . . . the relationship of a particular issue to a going federal program . . . . [T]he determination of one issue's relationship to the going program will not necessarily determine the relevance of the other issues in the same substantive area . . . ." Mishkin, *The variousness of "Federal Law": Competence and Discretion in the Choice of National and State Rules for Decision*, 105 U.Pa.L.Rev. 797, 804–05 (1957) (footnote omitted).

14. This case emphasizes the desirability of following state law in interpreting a release where, as here, such a course does not contravene federal policy.

329, 75 S.Ct. 865, 869, 99 L.Ed. 1122 (1955), this public interest does not prevent the injured party from releasing his claim and foregoing the burden of litigation. E. g. *Fabert Motors, Inc. v. Ford Motor Co.,* 355 F.2d 888, 890 (7th Cir.), *cert. denied,* 384 U.S. 939, 86 S.Ct. 1462, 16 L.Ed.2d 539 (1966); *Duffy Theatres, Inc. v. Griffith Consol. Theatres, Inc.,* 208 F.2d 316, 324 (10th Cir. 1953), *cert. denied,* 347 U.S. 935, 74 S.Ct. 629, 98 L.Ed. 1085 (1954). Since release of the private cause of action in no way dilutes the government's remedies against the antitrust violator, federal policy would not seem to require the condemnation of releases which are otherwise valid under the various state laws. Cf. *Main Line Theatres, Inc. v. Paramount Film Distributing Corp.,* 189 F.Supp. 314 (E.D.Pa. 1960) (Van Dusen, J.), *aff'd,* 298 F.2d 801 (3d Cir. 1962), *cert. denied,* 370 U.S. 939, 82 S.Ct. 1585, 8 L.Ed.2d 807 (1962).

■■■ The applicable Pennsylvania law is not incongruous with federal antitrust objectives.[15] In Pennsylvania, the general rule for construction of releases is that the intention of the parties must govern, but this intention must be gathered from the language of the release. *Evans v. Marks,* 421 Pa. 146, 218 A.2d 802 (1966). A signed release is binding upon the parties unless executed and procured by fraud, duress, accident or mutual mistake. *Kent v. Fair,* 392 Pa. 272, 140 A.2d 445 (1958). This approach guards against the antitrust violator's use of deception to avoid the federally-created cause of action, while at the same time it provides an adequate means to accomplish the private objectives of the parties.

■■■ We conclude that Pennsylvania law should govern the construction of the release in the present controversy.[16] A federal court would still be permitted, however, to reject the rule of a particular state whose doctrine on the interpretation of releases is not entirely consistent with federal antitrust objectives. As Justice Jackson noted in an often-quoted concurring opinion:

"A federal court sitting in a non-diversity case such as this does not sit as a local tribunal. In some cases it may

---

**15.** If a state law is to govern the instant case, it is clearly Pennsylvania law which should be applied. Both parties' briefs seem to make that assumption and the facts indicate that Pennsylvania is the only state concerned with the transaction. Three Rivers Motors' sole place of business was in Pennsylvania, the release contract was signed in Pennsylvania and the antitrust violation which economically injured Three Rivers was allegedly committed by a Ford-owned dealership operating in Pennsylvania. Having concluded that no state other than Pennsylvania has an interest in having its law applied, it becomes unnecessary to determine whether federal or state choice-of-law principles would have been employed to determine which state's substantive law to apply. See generally Note, *Applicability of State Conflicts Rules When Issues of State Law Arise in Federal Question Cases,* 68 Harv.L.Rev. 1212 (1955). Compare *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (holding that when federal courts decide matters within the scope of the *Erie* doctrine, they must employ the choice-of-law rules of the state in which they sit).

**16.** At least one commentator has similarly concluded that state law should generally govern the construction of antitrust releases:

"The issues concerning releases [of antitrust claims] rarely present justification for applying a federal rule, either to achieve uniformity or to further antitrust policy. A release is an independent contract entered into voluntarily as a result of arm's-length bargaining, subsequent to the accrual of the federal right to recover. Presumably, the injured party has been compensated by the settlement, and the violator has suffered the sanction, even if somewhat mitigated by out-of-court compromise. Federal policy would not seem to insist upon the injured party's undergoing the burden of litigation, and should not require the condemnation of releases which are valid under state law. Similarly, defenses sufficient to avoid releases under state law should be upheld. The antitrust purposes do not demand that the courts be alert to the possibility of fraudulently obtained releases, but state laws overwhelmingly hold such releases invalid. Should an occasional state rule be so harsh or unusual as to frustrate the intent of the statute, it can properly be disregarded." Note, *The Role of State Law in Federal Antitrust Treble Damage Actions,* 75 Harv.L.Rev. 1395, 1405 (1962) (footnotes omitted).

see fit for special reasons to give the law of a particular state highly persuasive or even controlling effect, but in the last analysis its decision turns upon the law of the United States, not that of any state. Federal law is no juridical chameleon, changing complexion to match that of each state wherein lawsuits happen to be commenced because of the accidents of service of process and of the application of the venue statutes. If is found in the federal Constitution, statutes, or common law. Federal common law implements the federal Constitution and statutes, and is conditioned by them. Within these limits, federal courts are free to apply the traditional common-law technique of decision and to draw upon all the sources of the common law in cases such as the present. *Board of Commissioners v. United States,* 308 U.S. 343, 350, 60 S.Ct. 285, 288, 84 L.Ed. 313." *D'Oench, Duhme & Co. v. F.D.I.C.,* 315 U.S. 447, 471–72, 62 S.Ct. 676, 686, 86 L.Ed. 956 (Jackson, J., concurring) (footnote omitted).

See also *Dice v. Akron, C. & Y.R. Co.,* 342 U.S. 359, 362, 72 S.Ct. 312, 314, 96 L.Ed. 398 (1952) (Ohio's strict standards for proving that a release was fraudulently obtained rejected as "wholly incongruous with the general policy of the [Federal Employers' Liability] Act").

*Construing the Release*

Turning now to the construction and validity of the release, two issues were presented to the District Court by Three Rivers. First, in its Petition to Set Aside a Release, Three Rivers asserted that it signed the release under duress. As alleged, the duress consisted of Ford's refusal to repurchase Three Rivers' inventory of parts, accessories, and equipment unless the release was signed, coupled with the fact that there was no

other available market where the items could be sold. Ford answered in a Motion to Dismiss the Petition, claiming that Three Rivers failed to set forth a sufficient basis to avoid or set aside the release. Specifically, Ford argued that "[u]nder applicable principles of law, the character of duress which is required to be shown in order to raise a question that a General Release was executed under duress must be of such a kind and character as to overcome the free volition of the party executing the release." In addition to answering Three Rivers' allegations of duress, Ford also requested the court to enter judgment in its favor pursuant to Rule 12, Fed.R.Civ.P., on the ground that the release is a complete bar to the antitrust cause of action.

 The District Court confined its decision to the construction of the release, never ruling on Three Rivers' allegation that the release was executed under duress. Assuming for the moment that the facts offered to demonstrate duress are as alleged by Three Rivers, they fail as a matter of law to constitute grounds for setting aside the release. At most, the facts indicate that economic conditions of the marketplace induced Three Rivers to sign the release, but there is no allegation that Ford applied any illegal pressure. Duress is not established merely by showing that the release was given under pressure of the financial circumstances disclosed here. Cf. *Colonial Trust Co. v. Hoffstot,* 219 Pa. 497, 504, 69 A. 52 (1908); accord, *Fabert Motors, Inc. v. Ford Motor Co.,* 355 F.2d 888, 890–91 (7th Cir. 1966); *The Adonis,* 38 F.2d 743, 744 (3d Cir. 1930). Moreover, under Pennsylvania law where the contracting party is free to come and go and to consult with counsel, there can be no duress in the absence of threats of actual bodily harm. *Carrier v. Wm. Penn Broadcasting Co.,* 426 Pa. 427, 430–31, 233 A.2d 519 (1967).[17] Thus, there

17. The Pennsylvania Supreme Court has stated:

"As to the defense of duress, the Superior Court, in *Smith v. Lenchner,* 204 Pa.Super. 500, 504, 205 A.2d 626 (1964), aptly stated

the applicable law as follows: 'We perceive no merit in appellee's contention that he was under duress when he executed and delivered the note in question. The threat purportedly made by appellant was not of phys-

can be no serious contention that Three Rivers was unlawfully coerced into signing the release in the instant case, since both parties were and are represented by competent counsel. Counsel for Three Rivers was an active participant in the negotiations and, in fact, extracted a substantial concession from Ford prior to the signing of the release. As originally proposed, the release contained no exception for third-party actions which Three Rivers might have against Ford based on "warranty, products, and parts liability." This exception was drafted only after Three Rivers' counsel conferred with Mr. Winterhalter and then requested that such an exception be made in order to preserve Ford's potential liability in the then-pending suit of Eazor Trucking Company against Three Rivers and Ford.

The second issue presented to the District Court by Three Rivers, and the only one on which the court ruled, was whether the parties intended to release accrued, but unknown, antitrust claims. Initially, the District Court examined the language of the release and found it to be ambiguous on its face as to whether it was intended to include anything more than matters relating to the sale of Three Rivers' assets.[18] Although the court conceded the operative language to be very broad, releasing "any and all

manner of action and actions," it concluded that an ambiguity arose from the parties' failure to include a "whereas" clause expressly stating their intention to settle all differences.[19] Since ambiguous language in a contract justifies resort to extrinsic evidence of intent,[20] the District Court went on to find that prior to signing the release the parties did not discuss the possibility of any antitrust violation[21] and that Three Rivers' President, Mr. Winterhalter, was unaware that Ford had given preferential treatment to its competitive factory-owned store.[22] From these extrinsic facts the court concluded that the parties did not intend the release to bar antitrust actions.[23]

We accept, as we must absent plain error, the District Court's factual conclusion that Mr. Winterhalter did not have in mind the specific possibility of an antitrust action when he signed the General Release. This alleged lack of knowledge is not sufficient, however, to modify clear and unambiguous terms of a written contract.[24] *Robert F. Felte, Inc. v. White,* 451 Pa. 137, 143–44, 302 A.2d 347 (1973); *Caplan v. Saltzman,* 407 Pa. 250, 254–55, 180 A.2d 240 (1962). The scope of our review, therefore, is limited to determining whether the District Court erred as a matter of law by

---

ical violence or of criminal process, indeed not even of civil process. . . . Duress has been defined as that degree of restraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or apprehension to overcome the mind of a person of ordinary firmness: [citing cases]. The quality of firmness is assumed to exist in every person competent to contract, unless it appears that by reason of old age or other sufficient cause he is weak or infirm: [citing a case]. Where persons deal with each other on equal terms and at arm's length, there is a presumption that the person alleging duress possesses ordinary firmness: [citing a case]. Moreover, *in the absence of threats of actual bodily harm* there can be no duress where the contracting party is free to consult with counsel: [citing cases].' " *Carrier v. Wm. Penn Broadcasting Co.,* 426 Pa. 427, 430–31, 233 A.2d 519, 521 (1967) (emphasis supplied).

18. *Three Rivers Motors Co. v. Ford Motor Co.,* 374 F.Supp. 620, 631 (W.D.Pa.1974).

19. *Id.* at 629.

20. Cf. *Robert F. Felte, Inc. v. White,* 451 Pa. 137, 143–44, 302 A.2d 347 (1973).

21. 374 F.Supp. at 629.

22. *Id.* at 631.

23. *Id.* at 633.

24. Mr. Winterhalter's alleged lack of knowledge was offered as extrinsic evidence only in connection with proving the parties' intentions and not as evidence of a mutual mistake of fact. Thus, the District Court correctly concluded that "[t]here was no indication of any fraud, accident, mistake or misrepresentation." *Id.* at 623.

holding the release to be ambiguous on its face.

Described at the outset as a "General Release," the agreement may be broken down for convenient analysis into three distinct parts: a recitation of the considerations passing between the parties, a statement of the types of actions being released, and an exception to the release. The description of considerations provides:

> "Three Rivers Motors Company . . . (hereinafter called 'the Dealer'), by W. A. Winterhalter, its President (hereinafter called 'the Principal') being the owner of the Dealer, for and in consideration of the sum of One Dollar paid to the Dealer by Ford Motor Company . . . and in consideration of Ford's providing substantial Dealer Development Funds to East Hills Ford, Inc. in order to purchase certain property of the Dealer, hereby jointly and severally, for itself, himself or herself, and their respective heirs, representatives, successors and assigns, releases, remises and forever discharges Ford and its successors and assigns . . . ."

Nothing in this language can be used to infer whether or not the parties intended a general settlement of all their accounts and liabilities. This clause is nothing more than a simple and orderly listing of the considerations given by Ford (i. e. one dollar plus its agreement to provide development funds) followed by the consideration given by Three Rivers (i. e. the release). The phrase "in order to purchase certain property of the Dealer" is included only to show that Ford's providing funds to East Hills Ford, Inc. conferred some benefit upon the "Dealer," Three Rivers, and, contrary to the District Court's implications,[25] does not indicate an intent to limit the release to matters concerning the sale and disposition of Three Rivers' assets. Moreover, even if it were assumed that the quoted phrase had some bearing on the scope of the release, an equally strong inference could be drawn that the sale was a total severance of the Ford-Three Rivers business relationship and the release, therefore, was intended as a final settlement.

The operative section of the release, describing the types of actions being released, is very broad:

> " . . . of and from all and all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever in law, in admiralty or in equity, which against Ford, the Dealer or the Principal, or their respective heirs, representatives, successors or assigns, ever had, now have or which they or any of them hereafter can, shall or may have, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of these presents. . . . "

This language is as comprehensive as language can be. The general words "all and all manner of action and actions . . . whatsoever in law, in admiralty or in equity . . . [which Three Rivers or Winterhalter] . . . ever had, now have or which they . . . hereafter can, shall or may have" indicates a clear intent to leave nothing open and unsettled between the parties. There is not the merest suggestion of a reservation of rights. Although the District Court was correct in noting that the phrase "known and unknown claims" does not appear, the phrase "ever had, now have or which they . . . hereafter can, shall or may have" amounts to the same thing. Under the law of Pennsylvania, this language will be construed as a general settlement of accounts and liabilities. In a case construing analogous language, the Pennsylvania Supreme Court explained:

> "It is true that ordinarily the words of a release should not be construed to

25. See 374 F.Supp. at 629, 630.

extend beyond the express consideration mentioned so as to make a release for the parties which they never intended or contemplated. Thus, general words of a release will not usually be construed to bar a claim which had not accrued at the date of the execution of the release (*Rapp v. Rapp*, 6 Pa. 45), nor a claim, the existence of which was not known to the party giving the release (*Cockroft v. Metropolitan Life Insurance Co.*, 125 Pa.Super. 293, 189 A. 687). But, the rule is merely one of construction, and is never applicable to bar a claim where the very language used by the parties excludes its use for that purpose. *Flaccus v. Wood*, 260 Pa. 161, 167, 103 A. 549.

"The release is very broad in its terms. It releases Brill, as also his heirs, executors, and administrators, not only 'of and from the said recited bond or obligation and of and from . . . the payment of any sum or sums of money therein named, and of and from the payment of any other sum or sums of money whatsoever for my past or future support and maintenance,' but also releases Brill, his heirs, executors and administrators 'of and from all manner of actions and causes of action, suits, debts, dues, accounts, bonds, covenants, contracts, agreements, judgments, claims and demands whatsoever in law or equity, which against the said J. Edward Brill I ever had . . . .'.

"The language of this release [indicates] that the parties had in mind a general settlement of all accounts up to that time . . . ." *Brill's Estate*, 337 Pa. 525, 527–28, 12 A.2d 50, 52 (1940) (emphasis added to the language paralleling the release in the instant case).[26]

Thus, Pennsylvania law is clearly that where the parties manifest an intent to settle all accounts, the release will be given full effect even as to unknown claims.[27]

The final section of the release lists the specific exceptions negotiated by the parties' attorneys immediately prior to the signing:

"... excepting herefrom, however, only such liability, if any, as Ford may have to the Dealer for warranty, products, and parts liability for which claims and/or suits are made/filed against Three Rivers Motors Co., with regard to sales and/or services performed by Three Rivers

---

26. See also *Dura Electric Lamp Co. v. Westinghouse Electric Corp.*, 249 F.2d 5 (3d Cir. 1957) wherein Circuit Judge Goodrich examined a remarkably similar release and concluded:

"The document of release, which sounds as though it had been taken from an old form book, is as broad as all out of doors and typical of the wasteful use of words in the English language in which lawyers sometimes indulge. It is set out verbatim in the margin because it is the heart of the case but setting it out does not carry the court's approval of it as a piece of English composition.

"It is to be noted that the language of the release is as general as language can be. There is nothing by which it may be interpreted as a covenant not to sue. There is nothing which even hints at a reservation of rights." 249 F.2d at 6–7 (footnote omitted). See also cases cited in *Duffy Theatres, Inc. v. Griffith Consol. Theatres, Inc.*, 208 F.2d 316, 323–24 nn.5–7 (10th Cir. 1953). The *Dura Electric* release is reproduced in full in 249 F.2d at 7 n.2.

27. Upholding the validity of the release in these circumstances does not offend public policy. We agree with those courts which have held that there is nothing in the public policy behind antitrust laws that prohibits general releases encompassing antitrust claims, provided that the release does not seek to waive damages from future violations of antitrust laws. See *Redel's Inc. v. General Electric Corp.*, 498 F.2d 95 (5th Cir. 1974); *Virginia Impression Products Co. v. SCM Corp.*, 448 F.2d 262 (4th Cir. 1971), *cert. denied*, 405 U.S. 936, 92 S.Ct. 945, 30 L.Ed.2d 811 (1972); *Gaines v. Carrollton Tobacco Bd. of Trade, Inc.*, 386 F.2d 757 (6th Cir. 1967); *Duffy Theatres, Inc. v. Griffith Consol. Theatres, Inc.*, 208 F.2d 316 (10th Cir. 1953), *cert. denied*, 347 U.S. 935, 74 S.Ct. 629, 98 L.Ed. 1085 (1954). Here, the release was not to have prospective application as it released Three Rivers' and its successors' claims or causes of action which they "ever had, now have or which they . . . can, shall or may have, upon or by reason of any matter . . . whatsoever *from the beginning of the world to the date of these presents* . . . ." (emphasis supplied).

Motors Co., on or before the date of the closing held on this date. It is understood that only one claim is now outstanding, namely, that of *Eazor Trucking Company v. Three Rivers Motors Co.*, and The Ford Motor Company, No. 1347 January Term, 1970, in the Court of Common Pleas of Allegheny County, Pennsylvania."

■ Scrutiny of this language further supports the view that the parties intended a complete settlement of accounts, rather than a release of only those claims arising out of the disposition of Three Rivers' inventory. The disposition of Three Rivers' inventory must be placed in proper perspective. The same parts, accessories and equipment repurchased by Ford originally had been sold by Ford to Three Rivers for retail sale to Three Rivers' customers. Ford's potential liability to Three Rivers, viewed solely as to claims arising from this sale and repurchase of inventory, was limited. Claims were not likely to be pressed against Ford for any materials, whether defective or not, which Ford repurchased from Three Rivers. When the release was signed, the most realistic threat of liability against Ford was the possibility of being sued by Three Rivers on a third-party claim arising from defective parts sold to Three Rivers' customers. Yet, the single category of claims expressly excluded from the release was third-party actions based on "warranty, products, and parts liability." Unless the comprehensive language releasing all types of claims is to be read as much ado about nothing, the release must cover more than those claims arising from Ford's repurchase of Three Rivers' inventory. The only reasonable conclusion is that the release was intended as a general settlement of accounts.

The District Court's decision that the "General Release" executed by Three Rivers Motors Company does not bar the antitrust cause of action will be reversed and the case remanded to the District Court with directions to grant Ford's motion to dismiss the antitrust action.