A hearing on the issue of damages will be scheduled for the earliest convenient date.

**INGRAM CORPORATION and Ingram Contractors, Inc.**

.v.

**J. RAY McDERMOTT & CO., INC., Oceanic Contractors, Inc., Halliburton Company, Brown & Root, Inc., Charles Leonidas Graves, Robert Kenneth Richie, James E. Cunningham and Hugh Wescott Gordon, Jr.**

Civ. A. No. 79–2575.

United States District Court, E. D. Louisiana.

Aug. 14, 1980.

Herbert J. Miller, Jr., Martin D. Minsker, William H. Jeffress, Jr., Steven Alan Reiss, Miller, Cassidy, Larroca & Lewin, Washington, D.C., James F. Neal, James V. Doramus, Neal & Harwell, Nashville, Tenn., Thomas B. Lemann, William J. Hamlin, Monroe & Lemann, New Orleans, La., for plaintiffs.

Denis McInerney, Michael P. Tierney, Cahill, Gordon & Reindel, New York City, Rutledge C. Clement, Harry A. Rosenberg, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for J. Ray McDermott & Co., Inc., Oceanic Contractors, Inc., Charles L. Graves, Robert K. Richie and James E. Cunningham.

Richard P. Keeton, Jacks C. Nickens, Scott, Douglass & Keeton, Houston, Tex., Don M. Richard, Dando B. Cellini, Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, La., for Brown & Root, Inc., Halliburton Co. and Hugh Wescott Gordon, Jr.

SEAR, District Judge.

This is a private antitrust action brought by Ingram Corporation and Ingram Contractors, Inc. (Ingram) against J. Ray McDermott & Co., Inc., Oceanic Contractors, Inc., Charles Graves, James Cunningham, and Robert Richie (collectively "McDermott"); and against Halliburton Co., Brown & Root, Inc. and Hugh Gordon (collectively "Brown & Root").[1]  Ingram alleges that the defendants engaged in a

---

1. Oceanic Contractors, Inc., whose name has now been changed to McDermott International, Inc., is a wholly owned subsidiary of J. Ray McDermott & Co., Inc.  At all times relevant to the complaint Charles Graves was president and chairman of the board of McDermott; James Cunningham was executive vice–president and chief administrator of McDermott; and Robert Richie was president of Oceanic and a director of McDermott.

Brown & Root, Inc. is a wholly owned subsidiary of Halliburton Co.  At all times relevant to the complaint Hugh Gordon was executive vice–president of Brown and Root.

worldwide bid rigging conspiracy between 1964 and 1971 designed to drive it out of the marine construction business. McDermott previously moved for summary judgment on the basis of two general releases which it executed with plaintiffs in 1973. On January 10, 1980 I denied that motion as to all state causes of action asserted in the complaint, but on March 19, 1980 I granted it as to all federal causes of action asserted therein. Ingram has moved for reconsideration of the March 19 decision and McDermott for that of the January 10 decision. In addition, Brown & Root has moved for a separate trial on the question of whether plaintiffs knew or should have known during the period of the conspiracy of the facts which form the basis for their claims. All three motions were argued on July 30, 1980 and taken under submission at that time.

*Background*

In its complaint Ingram claims that beginning no later than 1969 defendants agreed to rig their bids for offshore construction projects in such a way that it would eventually be driven from the offshore construction business. According to Ingram the defendants submitted artificially inflated bids on marine construction projects in those areas of the world where Ingram could not compete, but in those places where it could compete, they submitted artificially low bids. It asserts that

as a consequence, it was unable to secure any marine construction work except at ruinously low rates and so suffered serious financial losses which, by late 1971, threatened its financial ruin. Due to these financial problems, Ingram sold all of its marine construction assets to Oceanic on November 19, 1971 and has not been involved in the business since.

In the complaint Ingram charges specifically that the defendants (1) conspired to restrain trade in the maritime construction and contracting industry by rigging bids, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, (2) conspired to monopolize that industry by rigging bids, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, (3) engaged in a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. § 1961 *et seq.*, by defrauding purchasers of marine construction services in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud) and using the proceeds of that fraud in their businesses, and (4) committed various unlawful acts which render Ingram's sale of assets to Oceanic invalid due to error, fraud, and duress.[2] La.C.C. Arts. 1824 *et seq.*, 1847 *et seq.*, and 1950 *et seq.* On June 23, 1980 the plaintiffs amended their complaint to include three more pendent claims. Counts 5 and 6 of the amended complaint assert the

---

**2.** Section 1 of the Sherman Act provides in relevant part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

Section 2 of the Sherman Act makes it illegal to

> monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . .

Section 4 of the Clayton Act, 15 U.S.C. § 15, grants those persons injured in their businesses by reason of a violation of any of the antitrust laws the right to bring a private action against any such violator and to recover, if successful, treble damages, costs and a reasonable attorney's fee.

18 U.S.C. § 1962(a) provides in relevant part:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

"Racketeering activity" includes any act which is indictable under 18 U.S.C. § 1341 (mail fraud) or 18 U.S.C. § 1343 (wire fraud). 18 U.S.C. § 1961(1). A "pattern of racketeering activity" requires at least two acts of racketeering activity, the last of which has occurred within ten years after the commission of a prior act. 18 U.S.C. § 1961(5). 18 U.S.C. § 1964(c) gives private persons injured in their business or property by a violation of § 1962 the right to institute suit in an appropriate United States district court for treble damages, costs, and a reasonable attorney's fee.

**1324**

Louisiana law analogs of Counts 1 and 2, conspiracy to restrain trade and conspiracy to monopolize, violations of La.R.S. 51:122 and 123 respectively.[3] In Count 7 plaintiffs allege that two releases they entered into on July 20, 1973 with McDermott and Oceanic are void due to error, fraud and threats in violation of La.C.C. Arts. 1821 *et seq.*, 1847 *et seq.*, 1881 *et seq.* and 1950 *et seq.*

Before the complaint was amended, both McDermott and Brown & Root moved to dismiss the complaint on the ground that the statutes of limitations for the causes of action asserted therein have already run. All of plaintiffs' claims accrued no later than November 18, 1971, the date on which Ingram sold its marine construction assets to Oceanic and left the business and, therefore, unless the applicable statutes of limitations have somehow been tolled, all of their claims (including those in the amended complaint) are time–barred.[4] Plaintiffs allege that the defendants have fraudulently concealed the causes of action from Ingram, an allegation which, if proven, would toll

the statutes. *Prather v. Neva Paperbacks,* 446 F.2d 338 (5th Cir. 1971). In order to prove fraudulent concealment, plaintiffs must demonstrate

(1) wrongful concealment of their actions by the defendants–i. e., some affirmative deceptive act of the defendants which prevented discovery of the wrongful conduct. *Rutledge v. Boston Woven Hose & Rubber Co.,* 576 F.2d 248, 249–50 (9th Cir. 1978).

(2) their failure to discover the operative facts which form the basis of the cause of action within the limitations period, and

(3) their due diligence prior to discovery of these facts.

*Dayco Corp. v. Goodyear Tire & Rubber Co.,* 523 F.2d 389 (6th Cir. 1974).

In their motion to dismiss the defendants argued first that the complaint failed to allege adequately wrongful concealment and due diligence. I rejected that contention, holding that ¶ 44(b)–(e) of the complaint alleged the sort of affirmative acts of concealment required and that ¶ 25 and ¶ 46 adequately alleged due diligence.[5] Minute

3. La.R.S. 51:122 provides in relevant part,
   Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in this state is illegal. La.R.S. 51:123 provides in relevant part,
   No person shall monopolize, or attempt to monopolize, or combine, or conspire with any other person to monopolize any part of the trade or commerce within this state. La.R.S. 51:137 grants private persons injured by violations of any of the state's antitrust laws the right to sue those responsible and, if successful, to recover treble damages, costs, and a reasonable attorney's fee.

4. Counts 1 and 2 are governed by § 4B of the Clayton Act, 15 U.S.C. § 15b, which bars private federal antitrust claims unless brought within four years of the accrual of the cause of action. The RICO statute does not specify a limitations period, and therefore the analogous one–year period of Louisiana Civil Code Article 3536 applies. This one–year period also applies to the state antitrust claims. *Loews, Inc. v. Don George, Inc.,* 237 La. 132, 110 So.2d 553 (1959). The state law claims for rescission expire in five years. La.C.C. Art. 3542.

5. § 44 of the complaint provides in relevant part:
   At the time of negotiations leading to the sale agreement, as well as prior and subsequent thereto, the defendants, acting in ac-

cordance with and in furtherance of the conspiracy alleged herein, fraudulently concealed from plaintiffs the existence of the causes of action stated in this Complaint, through acts and omissions including but not limited to the following:

    ·    ·    ·    ·

(b) Submitting prearranged losing bids by the company that had agreed not to receive the award, in order to give the illusion of competition among the corporate defendants;

(c) Maintaining agreed–upon ratios of major equipment spreads, and positioning equipment in particular localities throughout the world, so as to give the false impression that excessive bids on particular projects were the result of equipment availability rather than of the unlawful conspiracy;

(d) Falsifying, destroying and concealing from accountants, auditors, independent directors and attorneys, records of the corporate defendants that would have revealed the existence of the unlawful conspiracies;

(e) Making payments of cash and other things of value to employees of customers, and to employees and former employees of the defendants, in order to prevent such employees from revealing to others their knowledge of the unlawful activities of the defendants in this Complaint;

    ·    ·    ·    ·    ·

Entry of January 10, 1980, pp. 4–8. In the alternative defendants asserted that the available evidence demonstrated that plaintiffs had in fact failed to exercise due diligence. I rejected that argument as well, holding that the evidence which defendants had submitted with the motion was subject to conflicting interpretations regarding plaintiffs' due diligence. *Id.* at 8–10.

McDermott also moved at that time for summary judgment on the basis of the releases exchanged in 1973 which plaintiffs seek to void via Count 7 of the amended complaint. The releases were entered into as part of a settlement of disputes arising from the 1971 sale agreement, which actually consists of three separate contracts:

(1) a Purchase Agreement, by which the assets were sold,

(2) a Subcontract Agreement, whereby Oceanic agreed to complete some of Ingram's offshore construction work in progress in exchange for its costs plus $10,000,000, and

(3) an Option Agreement, which gave Oceanic a right of first refusal if Ingram later elected to sell a damaged barge known as the INGRAM DERRICK BARGE 6.

After these agreements were executed, disputes arose concerning, *inter alia*, warranties of title to some of the foreign assets Ingram had sold to Oceanic and amounts due to Oceanic under the Subcontract Agreement. At the same time plaintiffs were demanding a recalculation of the formula on which the purchase price of the assets had been based. By early 1973 Oceanic was asserting claims for $11,000,000 in unpaid billings, and Ingram was asserting various claims against Oceanic in excess of $1,000,000.

The senior executives for both sides, accompanied by counsel, met for negotiations

intended to settle these disputes, and on April 23, 1973 a settlement was reached. Ingram agreed to pay Oceanic $1,233,651 and to convey the DERRICK BARGE 6 to Oceanic, and the parties also agreed to an exchange of general releases. The Settlement Agreement was executed on May 2, 1973, and the releases (two, one for each Ingram company) were executed on July 20, 1973. In each release the Ingram company involved "remised, released and forever discharged" the McDermott defendants:

from all manner of actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bill, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims, and demands whatsoever in law, in admiralty or in equity, which against them or any of them [releasor or its] successors or assignees hereafter can, shall or may have, in [its] own right or in a representative capacity, *for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of these presents, including without limitation of the generality hereof, any past, present, of future claims, matters or causes or things that [releasor has] or may hereafter have arising out of, based upon or in any way relating to the Purchase Agreement, the Subcontract Agreement, and the Agreement regarding the INGRAM DERRICK BARGE NO. 6,* all dated November 16, 1971, by and between Ingram Corporation, a Delaware corporation, and Oceanic (and, in the case of the Agreement regarding INGRAM DERRICK BARGE NO. 6, Ingram Contractors, Inc.) and the transactions contemplated thereby, EXCEPTING ONLY [two transactions not relevant here]. (Emphasis supplied)

¶ 25 of the complaint states in relevant part, . . . Despite the exercise of due diligence, plaintiffs were unaware of and did not discover the existence of causes of action set forth in this Complaint until on or about December 14, 1978.

¶ 46 *essentially repeats that contention.* Plaintiffs exercised all due diligence in informing themselves of facts that might give

rise to claims against the defendants but were prevented by the defendants' fraudulent concealment from learning of the existence of the causes of action stated in this Complaint until the return of the criminal indictment on December 14, 1978, described in paragraph 24 above.

McDermott asserted in its motion for summary judgment that these releases bar the antitrust and related claims brought here.[6] As to Count 4, a state law claim, I held that summary judgment was not warranted in view of a dispute created by the affidavits as to whether the parties intended that antitrust claims be comprehended by the releases. Since under Louisiana law parol evidence is always admissible to show the intention of the releasing parties, I concluded that this dispute of fact was material and justified denial of the motion as to that claim. Minute Entry of January 10, 1980, pp. 14–15. See *American Metal Window Co. v. St. Tammany Parish School Board*, 183 So.2d 667, 669 (La.App. 1 Cir. 1966).

However, finding myself bound by *Redel's, Inc. v. General Electric Co.*, 498 F.2d 95 (5th Cir. 1974), in which the Fifth Circuit held that federal law governs the interpretation of any asserted release of antitrust liability and does not permit consideration of parol evidence where the language of a release is unambiguous, I refused to consider the affidavits insofar as the federal claims were concerned.[7] Minute Entry of January 10, 1980, p. 11. I also rejected the assertions of Ingram that the releases were voidable because of duress or because they were "part and parcel" of the antitrust conspiracy. *Id.* at 12–13. I recognized that the releases might be voidable due to fraud, but as plaintiffs had presented no evidence of fraud in their opposition papers, I continued the motion for thirty days to allow them to submit such evidence. *Id.* at 13–14.

Plaintiffs responded with evidence intended to demonstrate, *inter alia*, that McDermott had fraudulently concealed the antitrust conspiracy from them through at least 1976.[8] They conceded that they were unable to provide admissible evidence on this point, but they argued via an affidavit submitted pursuant to F.R.C.P. 56(f) that discovery would lead to admissible evidence regarding fraudulent concealment and that the motion for summary judgment should therefore be denied as to the federal claims. The Rule 56(f) affidavit relied primarily on the records of three criminal cases, the most important of which is *United States v. J. Ray McDermott & Co., Inc., et al.*, Cr. # 78–422, E.D.La. (the "McDermott indictment").[9]

At ¶ 22(b) of the McDermott indictment the Grand Jury alleged that for a period beginning in 1960 and continuing through 1976, McDermott and Brown & Root conspired

> to submit collusive, non–competitive and rigged bids on marine construction projects in the Gulf of Mexico and in other geographic areas.

They designated a low bidder for every marine construction project and agreed that the other conspirator would submit an intentionally high, or complementary, bid in order to camouflage their agreement. McDermott indictment, ¶ 23(c)–(e).[10] More-

---

**6.** Brown & Root, not being a party to either release, makes no claim thereunder.

**7.** The logic of *Redel's* applies to any release of a RICO claim, which is a peculiarly federal cause of action. See *Dice v. Akron, Canton & Youngstown Railroad Co.*, 342 U.S. 359, 361–63, 72 S.Ct. 312, 314–15, 96 L.Ed. 398 (1952) and n.12, *infra*.

**8.** In addition to evidence of fraudulent concealment Ingram also submitted evidence regarding statements made by McDermott representatives in 1971 and 1973 concerning "stacked costs," a document entitled "Summary of Current Status with Ingram" which was used by McDermott during the 1973 negotiations, and certain statements made by Roger Wilson, then president of McDermott, and Jerrold Van Cise, a McDermott attorney, in 1971.

**9.** The other two indictments which Ingram cited are

1. *United States v. J. Ray McDermott & Co., Inc.*, Cr. # 78–87, E.D.La., and
2. *United States v. Ward*, Cr. # 78–437, E.D.La.

**10.** At ¶ 23(c)–(e) of the McDermott and Brown & Root had conspired to

(c) [designate] the low bidder on marine construction projects made subject to the aforesaid conspiracy;

(d) [exchange] information concerning bid amounts or bid ranges on marine construction projects made subject to the aforesaid conspiracy;

(e) [submit] intentionally high, or complimentary [sic], bids on marine construction projects on which one of the defendants or co–conspirators had been designated as the low bidder.

over, the positioning of equipment made it appear that the bids were based largely on equipment availability and that McDermott and Brown & Root were competing with each other. See affidavit of G. Glen Martin, ¶¶ 6–7.[11] Finally, the grand jury alleged that the conspirators were "submitting bids on marine construction projects containing false, fictitious and fraudulent statements and entries." McDermott indictment, ¶ 23(f).

The McDermott indictment and the Martin affidavit contained allegations which, if proven, would have substantiated the allegations that the defendants fraudulently concealed the conspiracy through 1976. In order to return the indictment, the grand jury must have had probable cause to make the accusations contained therein. See *United States v. Calandra*, 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974). It was therefore reasonable to assume that if allowed to proceed with discovery, Ingram would have been able to provide the court with evidence of a scheme of fraudulent concealment extending through the period of the release negotiations.

11. Paragraphs 6 and 7 of the G. Glen Martin affidavit state,

> During the time I was with Ingram I was aware that in the offshore contracting industry, generally, the location of major equipment owned by McDermott, Brown & Root, and Ingram, such as derrick barges, is published periodically in various industry journals. Also, I and other responsible company officers and employees made it a practice to keep abreast of where Ingram's competitors had positioned their equipment. Moreover, it is common knowledge in the industry that the personnel of the major companies kept abreast of the location of one another's equipment. My responsibilities with Ingram required that I continue to keep abreast of the location of equipment in the industry until the time of the sale. I had the impression that bids of McDermott and Brown & Root were based on the location of their equipment, and did not suspect an agreement between them to divide the market for marine contracting services. Had McDermott and Brown & Root not positioned their equipment to give the impression that the pattern of bidding was explained by equipment location, I and anyone else familiar with the industry might well have been able to detect indications of collusion in the pattern of bidding.

Nonetheless, on March 19, 1980, after receiving plaintiffs' submission of evidence, I dismissed the federal counts on the basis of the releases, holding that none of the evidence submitted was sufficient to raise an inference that McDermott had committed any fraudulent acts which render the releases voidable. I specifically held that the Rule 56(f) affidavit did not justify denial of the motion, stating

> [T]he fact that McDermott may have fraudulently concealed its bid rigging from the general public does not imply that it misled Ingram during the 1973 negotiations. The releases can be voided by fraud only if during the negotiations McDermott misrepresented material facts or concealed facts which would materially qualify those already stated; nothing contained in the criminal records provides any hint that this occurred.

(Minute Entry of March 19, 1980, p. 6) Those indictments allege acts which constitute fraudulent concealment of the antitrust conspiracy, but none of those acts can be equated to fraudulent misrepre-

> During the time prior to the Purchase and Subcontract Agreements it appeared to me that McDermott and Brown & Root were submitting competitive bids against each other. I and other Ingram personnel generally undertook to ascertain who in the industry was submitting bids on major jobs, and I had knowledge of such bids, and certain terms and conditions of such bids. It was common knowledge among the companies in the industry that such information was generally learned by personnel for the various companies. Had McDermott and Brown & Root not purported to be bidding against each other on most major projects, we would have known this, and it would have been obvious to us and anyone in the industry that there was collusion between the two. Furthermore, if they had not been bidding against each other on certain projects, but always bidding against Ingram, it would have indicated that their collusion was aimed at driving Ingram out of the business. After the Purchase and Subcontract Agreements, McDermott and Brown & Root did not dispel the appearance that they were competing against each other, and my perception of their purported competition remained unchanged up through and including the date of execution of the Settlement Agreement and Releases in 1973.

sentations in connection with the releases in 1973. (*Id.* at 8)

In other words, I determined that fraudulent concealment of the antitrust conspiracy did not constitute fraud which would vitiate the releases. Only some material misrepresentation made during the course of the negotiations leading to the releases would render them voidable.

### The Ingram Motion to Reconsider

■ Plaintiffs move for reconsideration of the March 19, 1980 decision on the ground that the distinction contained therein between fraud in the release and fraudulent concealment of the conspiracy is illfounded. Ingram's argument, although couched in legal terminology and studded with frequent citations, is grounded on common sense notions of equity and fairness. It contends that by providing incentives for antitrust conspirators to suppress evidence of their conspiracy, my holding fails to reach a proper accommodation between federal antitrust law and the law of general release. Rather than being penalized for suppressing such information, conspirators would find themselves free to seek general releases from their victims in some other context, secure in the knowledge that if any of the victims ever did discover the antitrust violations, the releases would protect them from any lawsuit based thereon. Plaintiffs assert that such a rule would not only sharply reduce the deterrent effect of the antitrust laws but would in no way contribute to the legitimate role that general releases play in the commercial world.

■ In response to Ingram's argument, McDermott has cited numerous cases to show that the federal courts will enforce

general releases against antitrust claims and that the law does not require a releasee to confess all possible claims which the releasor may have against it. Both assertions are correct, but neither is on point. The federal courts are in accord that antitrust claims are not immune from the effects of a general release which the parties have confected following arms length bargaining.[12] It is also clear that, absent, a legal duty to disclose as might arise from a fiduciary relationship, a party to a release should not be penalized for its silence concerning claims which the other side might have against it. See, e. g., *Redel's, supra, Virginia Impression Products Co. v. SCM Corp.*, 448 F.2d 262, 266 (4th Cir. 1971). Any party who enters into a general release, thereby releasing all claims, both known and unknown, takes a calculated risk, and it cannot rely on the other party to save it from the consequences of its act should it later find them more severe than anticipated. Indeed, were the law otherwise it would be virtually impossible for the courts ever to enforce a general release, a result which would greatly undermine the public policy which encourages compromise of differences. See *Redel's, supra.* However, none of the cases cited by McDermott address the narrow question raised by Ingram, for in none of them did the plaintiff prove that the defendants had concealed facts material to an antitrust cause of action during the period in which the release was negotiated, as Ingram alleges occurred in this case.[13] The issue is *res nova*, and given the dearth of authority, I must determine whether the public interest is served by enforcing a release against an antitrust claim in favor of a defendant who has tak-

---

12. The cases to this effect include, *inter alia, Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885 (3rd Cir. 1975); *Virginia Impression Products Co. v. SCM Corp.*, 448 F.2d 262 (4th Cir. 1971); *Aladdin Oil Co. v. Texaco, Inc.*, 603 F.2d 1107 (5th Cir. 1979); *Schott Enterprises v. Pepsico, Inc.*, 520 F.2d 1298 (6th Cir. 1975); *Richard's Lumber & Supply Co. v. United States Gypsum Co.*, 545 F.2d 18 (7th Cir. 1976); *Suckow Borax Mines Consolidated, Inc. v. Borax Consolidated, Ltd.*, 185 F.2d 196 (9th Cir. 1950); *Duffy Theatres, Inc. v. Griffith Consolidated Theatres, Inc.*, 208 F.2d 316 (10th Cir. 1953).

13. McDermott also argues that there is no nexus between the fraudulent concealment and the release since the object of the conspiracy, Ingram's sale of asserts, was achieved in 1971. This argument misses the point, for Ingram does not contend here that the releases were obtained as "part and parcel" of the conspiracy. Rather, the issue is whether active concealment of the causes of action during the period when the releases were negotiated constitutes fraud which renders the releases voidable.

en affirmative steps to prevent the releasor from discovering the existence of that claim.

In addressing this issue I must recognize that the federal courts have historically emphasized the Congressional policy which encourages private enforcement of antitrust claims. For instance, in *Redel's, supra,* the Fifth Circuit commented,

> There are two policies which must be accommodated. The first requires the greatest respect for private enforcement as the hallmark of the federal antitrust regulatory system. The second policy requires us to respect the amicable settlement and release of antitrust claims by the parties themselves. Where these policies are brought into conflict, the first must prevail.

498 F.2d at 100. Because of the primacy of private antitrust enforcement, the Supreme Court has rejected the common law defense of *in pari delicto* in an antitrust context.

> The plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition. A more fastidious regard for the relative moral worth of the parties would only result in seriously undermining the usefulness of the private action as a bulwark of antitrust enforcement. And permitting the plaintiff to recover a windfall gain does not encourage continued violations by those in his position since they remain fully subject to civil and criminal penalties for their own illegal conduct.

*Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 139, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982 (1968). Relying largely on *Perma Life,* the Fifth Circuit in *Wilson P. Abraham Construction Corp. v. Texas Industries, Inc.,* 604 F.2d 897 (5th Cir. 1979), held that antitrust violators may not recover contribution from their fellow tortfeasors, even if their violations were unintentional.

> [A] rule prohibiting contributions among antitrust coconspirators not only does not frustrate deterrence but may very well enhance the statutes' deterrent effect by preventing a defendant from cutting its losses.

*Id.* at 903.

It is largely because of the emphasis in the legislative history of the antitrust laws on the importance of private enforcement that courts have applied the doctrine of fraudulent concealment to toll the antitrust statute of limitations, § 4B of the Clayton Act, 15 U.S.C. § 15b. For instance, the Eighth Circuit, after a thorough review of the legislative history of § 4B, commented,

> We are not persuaded that Congress meant to proscribe and outlaw conspiracies and combinations in restraint of trade, only to reverse itself by enacting a statute of limitations that would reward successful conspirators. When the antitrust laws are violated, the wrongdoers who are successful in cloaking their unlawful activities with secrecy through cunning, deceptive and clandestine practices should not, when their machinations are discovered, be permitted to use the shield of the statute of limitations to bar redress by those whom they have victimized.

*Kansas City, Missouri v. Federal Pacific Electric Co.,* 310 F.2d 271, 284 (8th Cir. 1962). While there are some obvious differences between statutes of limitations and releases, they do have one major attribute in common. A statute of limitations accomplishes through operation of positive law the same thing that private parties accomplish on their own through a release—peace through extinction of an otherwise valid claim. For that reason the policy considerations which the Eighth Circuit discussed in *Kansas City* regarding fraudulent concealment also apply to releases. The policy supporting peaceful settlement of ·differences is little, if any, advanced by rewarding those antitrust violators who are able to cloak their unlawful activities.[14]

---

**14.** These same policy considerations apply to the RICO claim, 18 U.S.C. § 1961 *et seq.,* for which Congress took the antitrust laws as a model. The ABA actually suggested the private right of action contained in § 1964(c), which is said was "based upon the concept of

Section 471(b) of the Restatement of Contracts bolsters the above policy analysis. That section includes "concealment" within its definition of "fraud", and Comment f to § 471(b) defines "concealment" as "any affirmative act likely to prevent or intended to prevent knowledge of a fact." The Restatement's description of concealment which constitutes fraud is thus quite similar to the caselaw's description of concealment which is sufficient to toll an antitrust statute of limitations. See *Rutledge v. Boston Woven Hose & Rubber Co., supra, Dayco Corp. v. Goodyear Tire & Rubber Co., supra.* These passages from the Restatement indicate that the concealment alleged in ¶ 44(b)–(e) of Ingram's complaint constitutes fraud sufficient to render the releases voidable, provided the concealment continued through the period during which the releases were negotiated.

The above discussion demonstrates that the distinction which I drew in my March 19, 1980 minute entry between fraud in the release and fraudulent concealment of the antitrust conspiracy is not well–founded as a matter of public policy. The public welfare is not served by a legal doctrine which encourages deception and trickery, particularly in an area such as antitrust law where the legislative policy so strongly encourages private enforcement. Moreover, contrary to McDermott's assertions, voiding a general release when the releasee actively conceals material facts will not wreak havoc on the commercial world. Corporate negotiators will not be required to confess all their sins, real and imagined, before they can confect a valid general release. I hold only that they cannot act affirmatively to deprive those with whom they negotiate of material information they would otherwise receive.

A party who enters into a general release must make a reasoned decision as to whether the benefits of that release outweigh its possible consequences. If the other party to the release acts affirmatively to prevent him from discovering information which would affect that decisional calculus, the law should not allow it to benefit. Ingram has accused McDermott of concealing material information from it during the period when the releases were negotiated, and it has provided sufficient information in its Rule 56(f) affidavit for me to conclude that discovery is likely to yield probative evidence on this point. Therefore, the order of March 19, 1980 granting McDermott summary judgment on counts 1 to 3 of the complaint will be vacated, and the motion will be denied as to those counts.

*The McDermott Motion to Reconsider*

■ McDermott moves for reconsideration of my decision of January 10, 1980 denying its motion for summary judgment as to Count 4 of the complaint, in which plaintiffs alleged that the 1971 sale of assets to Oceanic was void due to error, fraud and duress.[15] In my minute entry of January 10 I held that state law, unlike federal law, always allows the introduction of parol evidence to determine the intent of the contracting parties as to the scope of a general release. I then found that the affidavits of Thomas O. Lind and Frederic B. Ingram created an issue of fact as to whether the parties to the 1973 releases had intended to release any claims going to the validity of the 1971 sale and subcontract agreements, as opposed to the implementation of those agreements. McDermott offers two arguments that this decision was incorrect.[16]

§ 4 of the Clayton Act." *Measures Relating to the Control of Organized Crime in the United States:* Hearings before Subcommittee No. 5 in the House Committee on the Judiciary, 91st Cong., 2d Sess., 543–44 (1970) (Statement of Edward L. Wright, president–elect of the ABA). Moreover, in introducing S. 1861, the predecessor of § 1964, Senator McClellan described the civil enforcement provisions as having "ample precedent in the antitrust laws." 115 Cong. Rec. 9567 (1969).

15. Several months after the motion for summary judgment was decided, Ingram amended its

complaint to allege three more pendent causes of action. The releases are equally applicable to all of these state law claims, and while McDermott's motion to reconsider formally addresses only Count 4, it is in fact addressed to Counts 5 through 7 as well.

16. As a third alternative McDermott contends that I should not exercise pendent party jurisdiction over the state law claims against it. In view of my decision to vacate the order of March 19, 1980 and deny McDermott summary judgment on the federal claims, this pendent jurisdiction argument is moot.

McDermott first argues that the Lind and Ingram affidavits submitted by plaintiffs fail to raise a material issue of fact as to the scope of the releases. The disputed language in the affidavits reads as follows:

> When substantially all of the subcontract work was completed, according to Ingram's calculations, it owed no more than approximately $1 million. McDermott was pressing a claim for approximately $11 million. In order to resolve these disputes and other disputes arising from the Purchase Agreement, both parties entered into settlement negotiations. It was our understanding and intent at the time to settle only disputes of this type. We did not intend the Settlement Agreement or Releases to reach or affect such claims as the antitrust claim in the Complaint (about which we knew nothing at the time, and which McDermott never disclosed to us) or even other claims which might have arisen, other than in the context of the sale of Ingram's assets and the Subcontract Agreement . .

(Affidavit of Thomas O. Lind, ¶ 4)

> During the course of the sale to McDermott, we entered into a subcontract agreement whereby Oceanic would perform Ingram's work in progress. Although Mr. Menapacce's [a lawyer who represented McDermott during the 1973 negotiations] account is not entirely accurate, I do agree that there were many disputes which did arise and which we intended to settle. Each of these disputes, however, was related to the sale of the equipment and the subcontract work, and as a result of my discussions with representatives of McDermott, it was my understanding at the time that we were settling only those types of claims. We certainly did not intend to release McDermott from the massive conspiracy which we have only recently discovered, and which is alleged in our Complaint.

(Affidavit of Frederic Ingram, ¶ 10)

McDermott asserts that these passages demonstrate only that Ingram has discovered that some of the causes of action it released are potentially lucrative and that it is therefore trying to escape from a broad compromise agreement which it entered into quite freely.

McDermott is misreading the import of these affidavits, particularly in light of the hornbook rule that on a motion for summary judgment, the inferences to be drawn from underlying facts must be viewed in the light most favorable to the opponent of the motion. *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Lind states that the negotiations leading to the releases were intended to settle all disputes "arising from" the subcontract and sale agreements. That language is somewhat ambiguous, but read in context it appears to refer only to disputes concerning the implementation of those agreements, for immediately thereafter Lind says that the Ingram representatives never intended to settle "such claims as the antitrust claim," apparently referring to claims going to the validity of the subcontract and sale agreements. Frederic Ingram's affidavit, while it uses even more general language, makes the same point. While they could have been more artfully drafted, these two affidavits do create an issue of fact as to the intended scope of the releases.

The three cases which McDermott cites as support for its position are all distinguishable. In *Henderson v. Stansbury,* 372 So.2d 1253 (La.App. 3 Cir. 1979), plaintiff signed a release with an insurance company of all claims arising out of an automobile accident for just under $1,000. Subsequently he discovered that his personal injuries, which he had believed were minimal, were fairly serious. The court nevertheless held that the release barred any suit for personal injury damages since the plaintiff had fully understood which claims he was releasing. Bad judgment was not sufficient reason to allow him to escape the terms of the release. In this case, by contrast, the affidavits call into question the understanding of the parties to the release. By the account of two of the Ingram negotiators, it is not that they failed to realize the value of potential antitrust and fraud claims but that they never knew such claims existed and that the parties never intended the releases to apply to them.

The other two cases cited by McDermott are similarly distinguishable, for in each a plaintiff who learned his damages were worse than first suspected tried to void a general release. In *Long v. Globe Indemnity Co.*, 144 So.2d 275 (La.App. 1 Cir. 1962), the court found that at the time plaintiff signed a general release for all claims arising out of an automobile accident, she had the physical symptoms upon which the subsequently filed lawsuit was based and therefore knew that the release covered personal injury as well as property damage. The situation in *Thigpen v. Guarisco*, 197 So.2d 904 (La.App. 1 Cir. 1967), was virtually identical. In *Long* and *Thigpen* the court found that in view of plaintiffs' symptoms, they must have realized which claims were being released. That conclusion does not necessarily hold here because the premise of knowledge on the part of the plaintiffs is a disputed issue of fact.

The affidavits submitted by Ingram, when read in the light most favorable to Ingram, indicate that the parties did not intend to release any antitrust claims in 1973. While this evidence is not particularly persuasive, I cannot rule on issues of credibility or weight on a motion for summary judgment. Since McDermott's first argument is founded upon an incorrect reading of these affidavits, it must fail.

■ McDermott contends alternatively that in the circumstances of this case, parol evidence bearing on the intent of the parties to the release is not admissible under Louisiana law. It offers three related grounds for this contention, the first being that parol evidence should not be admissible in a case such as this where experienced corporate officials and attorneys negotiated a settlement to a complex multi-million dollar dispute. It contrasts this to the Louisiana cases admitting parol evidence, all of which involve releases entered into by unsophisticated laymen. E. g., *Thigpen, supra, Meinerz v. Treybig*, 245 So.2d 557 (La.App. 3 Cir. 1971), *American Metal Window Co., supra, Webb v. Sonnier*, 272 So.2d 778 (La. App. 3 Cir. 1973), *Mooneyhan v. State Farm Mutual Automobile Insurance Co.*, 290 So.2d 405 (La.App. 2 Cir. 1974). However, the language of these cases, as well as the applicable provisions of the Civil Code, contradict McDermott's position.

In *American Metal Window* the court stated that "[e]vidence is always admissible to show the circumstances under which the release was executed and the true intention of the parties." 183 So.2d at 669. Accord, *Mooneyhan, supra, Webb, supra*. That principle derives directly from La.C.C. Art. 3073, which provides,

Transactions [i. e., releases] regulate only the differences which appear clearly to be comprehended in them by the intention of the parties, whether it be explained in a general or particular manner, unless it be the necessary consequence of what is expressed; and they do not extend to differences which the parties never intended to include in them . . .

By its terms Article 3073 applies to all releases, regardless of the context in which they were negotiated, and no case in Louisiana has ever interpreted it otherwise. It is true that courts in other jurisdictions have granted summary judgment where releases whose language was unambiguous were signed in a commercial context by parties with ready access to counsel. E. g., *Locafrance U. S. Corp. v. Intermodal Systems Leasing, Inc.*, 558 F.2d 1113, 1115 (2nd Cir. 1977), *Coester v. H.H.B. Co.*, 447 F.Supp. 372, 379 (D.S.D.1978). However, the language of the Louisiana cases and codal provisions is explicit, and I am controlled by them. While an uneducated layman is more likely than a large corporation to sign a release which, on its face, releases claims which were not intended to be extinguished, Louisiana law gives the corporation as well as the layman the chance to show that this happened.

McDermott offers two further justifications for refusing to consider parol evidence. First, it points to the fact that the language of the releases is "unambiguous" and that therefore any contention by the plaintiffs that they failed to understand the import of the releases is "plainly frivolous" and should not stand in the way of summary judgment. Given Ingram's position, supported by affidavit, that the parties signed

the releases as part of the settlement of various contractual disputes and never intended to release the antitrust claims or those related to them, there is nothing "plainly frivolous" about such a contention. McDermott is actually attacking the credibility of that contention, but that is not something which I can resolve on a motion for summary judgment.

In a similar vein McDermott notes that it never made any oral representations to limit the scope of the releases and that there is therefore nothing which parol evidence could show. The unstated premise seems to be that parol evidence concerning a release is admissible only to show that the parties reached some contemporaneous oral agreement regarding its effect. The Louisiana cases do not support this premise, for in them the courts have considered all evidence bearing on the intent of the parties, not just evidence of contemporaneous oral understanding. See, e. g., *American Metal Window Co.,* supra, *Long,* supra, *Meinerz,* supra. Moreover, in *Meinerz* the court considered parol evidence even though plaintiff admitted that there were no oral understandings regarding the scope of the release.

None of the three grounds asserted by McDermott for rejecting parol evidence bearing upon the scope of the releases is well–founded under Louisiana law. Since the parol evidence submitted by Ingram raises a material issue of fact as to the intent of the parties, summary judgment on the basis of the releases as to the state claims must be denied.[17]

*The Brown & Root Motion for Separate Trial*

■ Unless Ingram is able to prove at trial that the defendants fraudulently concealed their alleged antitrust conspiracy and that despite due diligence it did not learn of its potential claims until the return of the McDermott indictment, those claims will be barred by the applicable statutes of limitations. Even if tolled initially, the statutes will begin to run once plaintiffs have actual knowledge of their potential claims or knowledge of facts "calculated to excite inquiry" as to those claims. *In re Beef Industry Antitrust Litigation,* 600 F.2d 1148, 1171 (5th Cir. 1979). Brown & Root focuses particularly on the question of plaintiffs' knowledge and argues that a separate trial on the question of when plaintiffs first had actual or constructive knowledge of their claims is warranted under F.R.C.P. 42(b), which provides,

> The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim . . . or of any separate issue . . . always preserv-

---

17. McDermott has requested that, should I rule against it on the motions to reconsider, I certify my ruling to the Fifth Circuit Court of Appeals pursuant to 28 U.S.C. § 1292(b), which provides

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: Provided, however, That application for an appeal hereunder shall not stay proceedings in the district court unless the district court or the Court of Appeals or a judge thereof shall so order.

There is no doubt that my ruling here involves a controlling question of law, for if the releases are valid and enforceable against the claims brought by plaintiffs, McDermott has an absolute defense. Moreover, there is substantial ground for difference of opinion as to the correctness of my ruling today. However, in view of a probable delay of at least 18 to 20 months before a decision from the Fifth Circuit upon an appeal from this ruling, I am unable to conclude that an immediate appeal would advance the ultimate termination of this litigation. Even given the large amount of discovery which this case will require, trial should be completed before the Fifth Circuit is able to act. Furthermore, should the Court of Appeals determine my ruling here to be wrong, either wholly or in part, no retrial would be required. Therefore I decline to certify my decision on the motions to reconsider for interlocutory appeal.

ing inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

All issues in a case should normally be tried in the same proceeding. Wright & Miller comment at § 2388 of their treatise,

The piecemeal trial of separate issues in a single suit is not to be the usual course. It should be resorted to only in the exercise of informed discretion when the court believes that separation will achieve the purposes of the rule.

9 Wright & Miller, *Federal Practice and Procedure*, § 2388. Accord, *Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, 1323–34 (5th Cir. 1976). Brown & Root argues that since the issue of plaintiffs' knowledge of their claim would be dispositive if decided in favor of the defendants, I should sever that issue and try it quickly, thus saving everyone's time and money should defendants prevail. Plaintiffs counter that while severance of this issue may sometimes be appropriate, it is not so here, where much of the evidence relevant to proving lack of constructive knowledge of the claims prior to December, 1978 is also relevant to the substantive issues of liability and damages. See *Hooper v. Mountain States Securities Corp.*, 282 F.2d 195, 206 (5th Cir. 1960), Wright & Miller, *supra*.

Plaintiffs' position is correct. Defendants claim that, even if plaintiffs lacked actual knowledge of any price–fixing conspiracy, their heavy losses between 1969 and 1971 should have placed them on notice of the strong possibility of a conspiracy among their major competitors. Plaintiffs respond to that claim by asserting that certain actions which the defendants took in furtherance of the conspiracy also concealed the existence of that conspiracy despite their attempts to discover the reason for their losses. In particular, they assert in their complaint at ¶ 44(b)–(c) that the defendants submitted prearranged losing bids to give the illusion of competition and that they maintained agreed–upon ratios of major equipment spreads so as to give the false impression that excessive bids on particular projects were based on equipment availability.[18]

In order to prove their lack of actual or constructive knowledge, plaintiffs will have to present a substantial amount of evidence relevant to their substantive claims. Indeed, it seems impossible to delineate any boundary between the evidence relevant to the knowledge issue and that relevant to the substantive claims. Thus, a separate trial, rather than saving time and effort, will probably require duplication of both. Accordingly,

IT IS ORDERED that Ingram's Motion to Reconsider is GRANTED. The order dated March 19, 1980 granting McDermott summary judgment on Counts 1 to 3 of the complaint is VACATED, and summary judgment as to those counts is DENIED. IT IS FURTHER ORDERED that both McDermott's Motion to Reconsider and Brown & Root's Motion for Separate Trial are DENIED.